COMMONWEALTH *vs.* PAUL HOOD
(and three companion cases[1]).

Middlesex.   February 8, 1983. — July 5, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.

*Trespass.   Real Property,* Trespass, License.   *Constitutional Law,* State
    action, Freedom of speech and press.   *Necessity.   Practice, Criminal,*
    Motion in limine.

The fact that pedestrians and vehicles were regularly allowed to pass
    through a portion of certain premises on which a privately owned
    company operated an industrial laboratory did not change the private
    nature of the premises in a manner which would invoke the protec-
    tions of arts. 16 and 19 of the Massachusetts Declaration of Rights with
    respect to individuals distributing leaflets on the premises after being
    told to leave.   [584-586]
The operation of an industrial laboratory by a private corporation, on
    premises through portions of which pedestrians and vehicles were reg-
    ularly allowed to pass, did not implicate the public interest to the ex-
    tent that the premises might be deemed public as matter of Federal
    constitutional law under a public function theory.   [586-587]
On an appeal by defendants convicted of trespass for remaining on the
    premises of a private corporation, the operator of an industrial labor-
    atory, and distributing leaflets after being told to leave, the record did
    not establish such a relationship between the laboratory and the Fed-
    eral government as would present the question whether the exclusion
    of the defendants by security personnel of the corporation amounted to
    governmental action depriving the defendants of freedom of speech.
    [587-588]
A State prosecution of defendants who remained on privately owned
    premises occupied by an industrial laboratory and distributed leaflets
    after being told to leave, and who were later charged with trespassing,
    did not constitute State action discriminating against them on the basis
    of their exercise of any First Amendment right.   [588-589]
Defendants prosecuted for trespassing on private property occupied by an
    industrial laboratory had no implied license to enter and remain upon

---

[1] Complaints were sworn against Suzanne Belote, Robert W. Hillegass,
and Jean Holladay.

the premises for the purpose of distributing leaflets, where the owner had indicated by posted notice that trespassing was forbidden and where the defendants had been requested to leave by the tenant's security personnel. [589-590]

At the trial of defendants on complaints charging trespass, following their arrest while distributing leaflets on private premises occupied by an industrial laboratory, no error appeared in the judge's allowance of the Commonwealth's motions in limine which precluded the introduction of evidence to establish the defense of necessity, or "competing harms," where the harm which the defendants sought to prevent, namely, the manufacture of nuclear weapons and the resulting increased risk of war, could not reasonably have been expected to abate as the direct result of the defendants' activities and where the defendants would have been able to employ lawful means in order to attempt to abate the danger. [590-595] Liacos, J., concurring.

Discussion of the appropriateness in a criminal case of allowing a motion in limine by the Commonwealth. [591-595]

Certain remarks by the foreman of the jury on returning verdicts of guilty in a criminal case did not show that the jurors had failed to find the defendants guilty beyond a reasonable doubt. [595-596]

COMPLAINTS received and sworn to in the Third Eastern Middlesex Division of the District Court Department on December 22, 1981.

Motions in limine were heard by *Sherman, J.*, and the cases were tried before *Chernoff, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Charles J. Hayes* for the defendants.

*Kevin J. Ross*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J.    After a jury trial in a District Court, the defendants were convicted of trespassing, in violation of G. L. c. 266, § 120, and each was fined $50.[2]    The fines

---

[2] General Laws c. 266, § 120, as amended through St. 1978, c. 447, § 3, provides in relevant part: "Whoever, without right, enters or remains in or upon the . . . buildings . . . or improved or enclosed land . . . of another, after having been forbidden so to do by the person who has lawful control of said premises, either directly or by notice posted thereon . . . shall be punished by a fine of not more than one hundred dollars . . . ."

were suspended pending appeal. We took the cases on our own motion. We affirm the judgments of conviction.

The facts are as follows. At 7:30 A.M., on December 21, 1981, approximately thirty people gathered in a public park across the street from the Charles Stark Draper Laboratory, Inc. (Draper), in Technology Square, Cambridge. At 8 A.M., they crossed the street and entered an outdoor courtyard on Draper premises. A Draper security officer ordered the group to leave, and everyone but the four defendants complied with his request. Security officers then asked each defendant to leave, and informed each defendant that if he or she did not leave, he or she would be arrested. There were also two "No Trespassing" signs posted in the courtyard. The defendants, however, remained on the premises, attempting to pass out leaflets to Draper employees. These leaflets, which were ruled inadmissible at a pretrial hearing, advocated nonviolence as a means to avert nuclear war.

In response to a summons by the security officers, three Cambridge police officers arrived at Draper and informed the defendants that they were trespassing and that if they did not leave the premises they would be arrested. The defendants remained, and were arrested about 8:30 A.M. The captain of the Draper security force, Thomas W. Murphy, testified that the premises on which the defendants were arrested are leased by Draper from a Boston real estate company and are maintained by Draper. The complex in which Draper is located is bounded on three sides by public roads and on the fourth by railroad tracks. Murphy testified that pedestrians and cars were permitted to pass through the complex, including Draper premises. He also testified that the defendants were asked to leave because they were distributing leaflets.

The foreman of the jury delivered verdicts of guilty of trespass. He then stated, on behalf of the jury, that "these findings are based on a narrow interpretation of the law. We feel that there are important philosophical and perhaps moral questions that transcend the scope of this trial. We feel they should be debated in the broadest possible forum."

Prior to the trial, the Commonwealth filed motions in limine requesting that the judge exclude "evidence consist-[ing] of the defendants' reason for being upon the premises alleged to have been trespassed, to wit:  [distributing leaflets], and the content of said leaflets."  The motion judge explained to the defendants, who proceeded pro se, that justification is a defense to a charge of trespass, but that if the reason the defendants were on the premises did not constitute legal justification it would be irrelevant, and so excluded.  Hillegass read a brief statement on behalf of all the defendants indicating that, in accordance with their religious beliefs, they were present at Draper to try to halt the development of nuclear weapons.  The judge then allowed the motions, except as to the defense of consent. Hood then asked whether the ruling meant "that we may not speak about our reasons for going to Draper during our trial," and the judge told him that that was correct.

The defendants raise four arguments on appeal.  First, they claim that their convictions violated their rights to freedom of religion, speech, and assembly under the First and Fourteenth Amendments to the United States Constitution, and arts. 1, 16, and 19 of the Massachusetts Declaration of Rights, and their right to defend their lives and liberties under art. 1.  In support of these contentions, they claim that the Draper premises were public under Federal constitutional principles, and that the judge's pretrial ruling denied them the opportunity to establish this fact.  Second, they claim that their activities were protected under *Commonwealth* v. *Richardson*, 313 Mass. 632 (1943).  Third, they assert that the judge erred in granting the Commonwealth's motions preventing the introduction of evidence as to justification.  Finally, the defendants contend that the foreman's statement on behalf of the jury indicates that they were not found guilty beyond a reasonable doubt.

The guarantees of the First and Fourteenth Amendments apply to government action.  See *Hudgens* v. *NLRB*, 424 U.S. 507, 521 (1976); *Meyer* v. *Massachusetts Eye & Ear Infirmary*, 330 F. Supp. 1328, 1331 (D. Mass. 1971); *McQueen*

v. *Druker*, 317 F. Supp. 1122, 1127 (D. Mass. 1970), aff'd, 438 F.2d 781 (1st Cir. 1971). In *Commonwealth* v. *Noffke*, 376 Mass. 127, 134 (1978), we relied on Federal constitutional law in holding that arts. 16 and 19 did not protect the activities of a nonemployee soliciting for a labor union in the parking lot of a private hospital, because "[arts.] 16 and 19 protect the rights of free speech and assembly from abridgment by the government." Subsequently, in *Batchelder* v. *Allied Stores Int'l, Inc.*, 388 Mass. 83, 89 (1983), we "reject[ed] any suggestion that the Declaration of Rights should be read as directed exclusively toward restraining government action." Specifically, we held that art. 9 protects the collection of signatures to obtain access to a ballot, in the common area of a privately owned shopping mall. We noted that *Noffke* was decided before the Supreme Court held in *PruneYard Shopping Center* v. *Robins*, 447 U.S. 74 (1980), "that States were free to fashion their own constitutional principles concerning the exercise of free speech in the common areas of large shopping malls." *Batchelder* v. *Allied Stores Int'l, Inc.*, *supra* at 89-90 n.8.

*Batchelder* did not establish that there is no State action requirement under arts. 16 and 19. We stated: "It is important that we carefully define the issue that this case presents. We are concerned with ballot access and not with any claim of a right to exercise free speech rights apart from the question of ballot access." *Batchelder* v. *Allied Stores Int'l, Inc.*, *supra* at 91. Moreover, even if State action were not required, *Batchelder* does not suggest that we would extend the protections of arts. 16 and 19 to the instant cases. The plaintiff's conduct in *Batchelder* occurred in a large shopping mall, visited on the average by 175,000 to 200,000 people each week. The mall scheduled special events weekly, to attract customers and to create goodwill in the community. In *Batchelder*, *supra* at 89-90 n.8, discussing *Noffke*, we recognized that "[t]he difference between the parking lot of a private hospital and the common area of a multiestablishment shopping center is significant." Cf. *State* v. *Schmid*, 84 N.J. 535, 563-569 (1980), appeal dis-

missed sub nom. *Princeton Univ.* v. *Schmid,* 455 U.S. 100 (1982); *Commonwealth* v. *Tate,* 495 Pa. 158, 173-176 (1981). In the instant cases, the defendants were distributing leaflets on the property of a private business, during its regular business hours, and while business was apparently being conducted as usual. The fact that members of the public were allowed to pass through Draper's property does not change the essential nature of the premises.[3]

The defendants attempt to improve their position by showing that Draper was public property under Federal constitutional principles. They first argue that the facts of their cases are similar to those of *Marsh* v. *Alabama,* 326 U.S. 501 (1946). *Marsh* held that, under the First and Fourteenth Amendments, a State could not prosecute a person for trespassing based on her attempts to distribute religious literature on the premises of a company-owned town. The Court reasoned that, although the town was privately owned, it was subject to the strictures of the First Amendment because the operation of a town is a public function. *Marsh* v. *Alabama, supra* at 505-510. "Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free." *Id.* at 507.

*Marsh* is inapplicable to the instant cases. Draper is a place of business, and operating a business is not a public function, but rather is a traditionally private endeavor. The fact that Draper allowed pedestrians and cars to pass through its property does not alter the public function analysis. A business need not wall itself in in order to maintain nonpublic status. The crux of the matter is that the conduct of a private business such as Draper does not impli-

[3] Our discussion has focused on rights of free speech and assembly, rather than the right to religious freedom under art. 2, or the right to self-defense under art. 1. However, all of the alleged violations of the defendants' rights here are based on their convictions of trespass as a result of distributing leaflets at Draper. In these circumstances, our discussion is equally applicable to the defendants' arts. 1 and 2 rights.

cate the public interest to the extent that its premises may be deemed public under a public function theory. This is made even clearer by subsequent cases, which limit the scope of *Marsh.* In *Hudgens* v. *NLRB,* 424 U.S. 507, 513-521 (1976), the Court held that the First and Four- teenth Amendments did not protect employees picketing a company's retail store located in an enclosed shopping mall. Quoting from an earlier opinion, *Lloyd Corp.* v. *Tanner,* 407 U.S. 551, 568-569 (1972), the Court rejected the argu- ment that "a large shopping center . . . 'open to the public,' serves the same purposes as a 'business district' of a munici- pality, and therefore has been dedicated to certain types of public use." *Hudgens* v. *NLRB, supra* at 519. Cf. *Flagg Bros.* v. *Brooks,* 436 U.S. 149, 157-164 (1978). Since the premises of Draper are more private than those of a shop- ping mall, it is clear that the Draper premises were not public property under the public function theory.

The defendants next argue that there was an interde- pendent, or symbiotic, relationship between Draper and the United States government sufficient to establish governmen- tal action under the theory of *Burton* v. *Wilmington Park- ing Auth.,* 365 U.S. 715 (1961). See *Blum* v. *Yaretsky,* 457 U.S. 991, 1004-1005 (1982); *Jackson* v. *Metropolitan Edison Co.,* 419 U.S. 345 (1974); *Moose Lodge No. 107* v. *Irvis,* 407 U.S. 163 (1972); *Bello* v. *South Shore Hosp.,* 384 Mass. 770, 772-776 (1981); *Phillips* v. *Youth Dev. Program, Inc.,* 14 Mass. App. Ct. 626 (1982); *McQueen* v. *Druker,* 438 F.2d 781 (1st Cir. 1971). They claim that "the Draper Laborato- ry facilities . . . are operated primarily to benefit the United States Government," apparently based on alleged govern- ment contract work performed by Draper. Even if it had been shown that Draper performed work under contract with the Federal government, that alone would not have constituted governmental action. See *Rendell-Baker* v. *Kohn,* 457 U.S. 830, 842-843 (1982). Compare *Dobyns* v. *E-Systems, Inc.,* 667 F.2d 1219, 1226-1228 (5th Cir. 1982); *Holodnak* v. *Avco Corp.,* 514 F.2d 285, 289-290 (2d Cir.), cert. denied, 423 U.S. 892 (1975); *McQueen* v. *Druker,*

*supra* at 784-785. In any case, there was no evidence presented at trial as to Draper's business, or its relationship with the Federal government. The defendants contend that the allowance of the Commonwealth's motions in limine precluded the introduction of such evidence. After careful consideration of the record, we disagree. The motions by their terms were directed to "evidence . . . of the defendants' reason for being upon the premises," or their justification defense. The motion judge so interpreted the motions, stating, "[t]he D. A. tells me in this motion [*sic*], that she anticipates that at the time of trial, one or more of you may wish to introduce evidence concerning the reason that you were allegedly trespassing on the property. Now, if that reason constitutes legal justification, I would, of course, allow it in . . . ." After his ruling, he explained: "I have just ruled . . . that based upon the statements that one of the co-defendants [Hillegass] has made in this case that what you have just told me does not constitute legal justification." The transcript of the hearing indicates that the defendants understood the purpose of the motions: Hood stated that the ruling meant "we may not speak about our reasons for going to Draper during our trial." We recognize that evidence of Draper's business would have been relevant to show both the existence of justification and the existence of State action under a symbiosis theory. However, there is no indication that such evidence would have been excluded had it been submitted for the latter purpose.

The defendants also rely on *Shelley* v. *Kraemer*, 334 U.S. 1 (1948), arguing that State enforcement of the trespass statute against them here constitutes impermissible State enforcement of private discrimination. In *Shelley*, neighboring property owners sought to enforce a private, racially restrictive agreement to prevent the sale of a house by a white seller to a black purchaser. The Court held that judicial enforcement of the agreement constituted State action. The Supreme Court has not developed *Shelley* beyond these facts, and we do not think it applies to judicial enforcement of a trespass statute at the instance of a private property

owner, nor to alleged discrimination based on the exercise of First Amendment rights. Cf. *Hudgens* v. *NLRB,* 424 U.S. 507 (1976). The cases cited in the defendants' brief do not rely on *Shelley* v. *Kraemer, supra.* See *Griffin* v. *Maryland,* 378 U.S. 130 (1964); *Peterson* v. *Greenville,* 373 U.S. 244 (1963); *Edwards* v. *South Carolina,* 372 U.S. 229 (1963); *Garner* v. *Louisiana,* 368 U.S. 157 (1961); *Boynton* v. *Virginia,* 364 U.S. 454 (1960).

The defendants raise the nonconstitutional claim that they had an implied license to enter the Draper premises based on *Commonwealth* v. *Richardson,* 313 Mass. 632 (1943). In that case, the defendants, Jehovah's Witnesses, entered the vestibule of an apartment building through an unlocked outer door. The owner ordered them to leave the vestibule, but the defendants refused and proceeded to ring the doorbells of the apartments. Some of the tenants allowed the defendants into the building. The owner then summoned the police, who arrested the defendants. *Id.* at 635-636. We noted that although G. L. c. 266, § 120, forbids entering or remaining on premises without right, so that either act is a crime, the defendants were charged only with unlawful entry. *Id.* at 637. We concluded that by supplying bells in the vestibule, "an implied license was granted . . . to [those] engaged in lawful pursuits to make use of them for the purpose of seeking an interview with the tenants." *Commonwealth* v. *Richardson, supra* at 638. Once a tenant unlocked the door, the defendants were implied licensees of the tenant, based on "the usages of the community." *Id.* at 639. A tenant has a right to admit any visitor. *Id.* at 640.

From the foregoing, it is clear that *Richardson* is not applicable to the instant cases. The owner indicated by posted notice that trespassing was forbidden. See G. L. c. 266, § 120; *Fitzgerald* v. *Lewis,* 164 Mass. 495, 500-501 (1895). The tenant, Draper, indicated through its security officers, that it did not want the defendants on the premises. Unlike tenants in an apartment building, employees do not generally have the right to invite visitors to their place of

employment. Even if they had such a right, there was no showing that any Draper employee did anything analogous to the unlocking of the door in *Richardson* which might be construed as an invitation to enter the property.

Moreover, the rule set forth in *Richardson* at most protected the defendants only until Draper's security officer asked them to leave. The rule only allows a person with a legitimate purpose to be protected from a trespassing charge for his entry onto another's property to determine whether the person in control wishes to deal with him and for his passage off the property if he receives a negative answer. Thus, in *Commonwealth* v. *Richardson, supra* at 638, we stated that G. L. c. 266, § 120, "protect[s] the rights of those in lawful control of property to forbid entrance by those whom they are unwilling to receive, and to exclude them if, having entered, those in control see fit to command them to leave." In the instant cases, the defendants were charged both with entering and remaining on Draper premises without right. Even if they had an implied license to enter based on *Richardson,* they had no right to remain after those with lawful control of the property asked them to leave.

The defendants' main contention is that the motion judge erred in allowing the Commonwealth's motions in limine, which precluded the introduction of evidence to establish a defense of necessity or competing harms. "In essence, the 'competing harms' defense exonerates one who commits a crime under the 'pressure of circumstances' if the harm that would have resulted from compliance with the law . . . exceeds the harm actually resulting from the defendant's violation of the law. At its root is an appreciation that there may be circumstances where the value protected by the law is, as a matter of public policy, eclipsed by a superseding value . . . ." (footnote omitted). *Commonwealth* v. *Brugmann,* 13 Mass. App. Ct. 373, 376-377 (1982). See W. LaFave & A.W. Scott, Jr., Criminal Law § 50 (1972); Model Penal Code § 3.02 (Proposed Official Draft 1962); Proposed Criminal Code of Massachusetts c. 263, § 40 (1972) (harm

sought to be avoided must be clearly greater); *Commonwealth* v. *Thurber,* 383 Mass. 328, 330-331 (1981); *Commonwealth* v. *O'Malley,* 14 Mass. App. Ct. 314 (1982). Cf. *Rossi* v. *DelDuca,* 344 Mass. 66, 69-70 (1962). The defendants argue that the harm caused by their trespass was outweighed by the harm they acted to prevent, namely, the nuclear arms race. They rely on *Commonwealth* v. *Brugmann, supra,* and argue that the judge's ruling was incorrect under standards established in that case for evaluating the sufficiency of a competing harms defense. Thus, they assert they were "entitled to show . . . what United States weapons policy is . . . and the imminent harm posed by the weapons, as well as the [role] of Draper Laboratory in [its] implementation and effectuation . . . ."

The Appeals Court has twice considered the application of the competing harms defense to charges of trespass on the premises of nuclear power plants. In *Commonwealth* v. *Brugmann, supra,* the defendants entered a restricted area of a nuclear power plant in an attempt to shut down the plant because of alleged hazardous radiation leakages. The court held that the trial judge correctly ruled that the competing harms defense was unavailable. Based on a review of the relevant authorities, the court concluded that "the application of the defense is limited to the following circumstances: (1) the defendant is faced with a clear and imminent danger, not one which is debatable or speculative; (2) the defendant can reasonably expect that his action will be effective as the direct cause of abating the danger; (3) there is [no] legal alternative which will be effective in abating the danger; and (4) the Legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue." *Commonwealth* v. *Brugmann, supra* at 379. See W. LaFave & A.W. Scott, Jr., Criminal Law § 50, 387-388 (1972); Model Penal Code § 3.02 (Proposed Official Draft 1962). The court reasoned that, although the facts tended to show an immediate danger which the defendants could reasonably expect to avert by their actions, the defendants had legal alternatives to the trespass.

In *Commonwealth* v. *Averill,* 12 Mass. App. Ct. 260 (1981), the defendants had been distributing leaflets in a private park, maintained as part of a nuclear facility complex, which was open to the public during the day. When they refused to leave at closing time, they were arrested. The trial judge ruled that the necessity defense was unavailable. The Appeals Court upheld his ruling, on the ground that the defendants could not have reasonably anticipated a direct causal relationship between their act and the avoidance of the harm. "The only impact they could hope to make . . . was through the news of their arrest. However that might assist their cause in the long run, publicity designed to marshal public opinion could not extinguish an immediate peril, if there was one." *Commonwealth* v. *Averill, supra* at 262. The court also noted that the necessity defense "deals with obvious and generally recognized harms, not with those which are debatable and, indeed, the subject of legislation and government regulation." *Id.* at 262-263.

As the *Brugmann* court noted, *supra* at 378, a number of courts have held that the competing harms defense is inapplicable to a charge of trespass on the premises of a nuclear power plant. Moreover, in a case similar to the instant cases, the Supreme Court of Hawaii held that the competing harms defense did not exonerate defendants charged with trespassing on the property of Honeywell Corporation, allegedly to protest the corporation's role in manufacturing weapons. *State* v. *Marley,* 54 Hawaii 450, 471-473 (1973). That court reasoned that the defendants had legal alternatives, that there was no imminent harm, and "most importantly" that no reasonable person could find there was a direct causal relationship between the defendants' actions and the avoidance of the alleged harm, since "[u]nder any possible set of hypotheses, defendants could foresee that their actions would fail to halt Honeywell's production of the war material . . . ." *State* v. *Marley, supra* at 473. Accord *United States* v. *May,* 622 F.2d 1000, 1008-1009 (9th Cir.), cert. denied sub nom. *Phipps* v. *United States,* 449

U.S. 984 (1980) (trespass on naval base in order to protest Trident missile system); *United States* v. *Cassidy*, 616 F.2d 101, 102 (4th Cir. 1979) (defacing Pentagon building in course of demonstration against nuclear weapons); *United States* v. *Simpson*, 460 F.2d 515, 517-518 (9th Cir. 1972) (mutilating selective service records to protest Vietnam War).

We find the reasoning of *Averill* and *Marley* equally applicable to the instant cases. The defendants were trespassing in order to distribute literature opposing the nuclear arms race. They could not have reasonably expected their actions to abate the alleged danger directly. Cf. *Commonwealth* v. *Brugmann, supra* (trespass would automatically close down nuclear power plant, thereby stopping alleged radiation leaks). Indeed, as they assert in their brief, their conduct "was directed at raising serious questions of worldwide import concerning the legality of United States weapons policy." "[P]ublicity designed to marshal public opinion could not extinguish an immediate peril, if there was one." *Commonwealth* v. *Averill, supra* at 262. Nor did the defendants lack legal alternatives to abate the danger. Other avenues were available, including use of publicity media, distribution of literature at an appropriate site, and participation in the political process. See *State* v. *Marley, supra* at 472; W. LaFave & A.W. Scott, Jr., *supra* at 387-388.[4]

The judge ruled that the competing harms defense was unavailable after a pretrial hearing on the motions in limine. The defendants argue that the jury should have been allowed to decide whether the defendants established a competing harms defense. "A judge need not charge the

---

[4] The defendants also argue that their conduct was justified as action taken in self-defense or. in defense of others. "[D]efense of others is a justification of very specific application. We do not think it was meant to apply in a case involving civil disobedience of the sort in issue, particularly since other remedies were available to redress the present grievances. For the same reasons, we also consider the doctrine of self-defense inapplicable in this context." *Commonwealth* v. *Brugmann*, 13 Mass. App. Ct. 373, 383 (1982). See *Commonwealth* v. *Monico*, 373 Mass. 298 (1977); *Commonwealth* v. *Martin*, 369 Mass. 640 (1976).

jury on a hypothesis not supported by evidence. The question of necessity is fairly raised only if there is evidence that would warrant a reasonable doubt whether the [trespass] was justified by necessity." *Commonwealth* v. *Thurber,* 383 Mass. 328, 331 (1981). However, the rulings on the motions in limine prevented even the introduction of evidence in support of the competing harms defense. "The purpose of a motion in limine is to prevent irrelevant, inadmissible or prejudicial matters from being admitted in evidence . . . and in granting such a motion, a judge has discretion similar to that which he has when deciding whether to admit or exclude evidence . . ." (citations omitted). *Commonwealth* v. *Lopez,* 383 Mass. 497, 500 n.2 (1981). See *Commonwealth* v. *O'Malley,* 14 Mass. App. Ct. 314, 323-324 (1982). Such motions are typically directed at specific items of evidence or testimony. See, e.g., *Commonwealth* v. *Barber,* 14 Mass. App. Ct. 1008 (1982) (defendant's refusal to give urine sample); *Commonwealth* v. *Nighelli,* 13 Mass. App. Ct. 590 (1982) (references to defendant's other crimes); *Commonwealth* v. *Bailey,* 12 Mass. App. Ct. 104 (1981) (letter which indicated defendant had been in jail); *Commonwealth* v. *Lopez, supra* at 499-500 (related complaints, on which defendant was acquitted). See generally Annot., 63 A.L.R.3d 311 (1975); Rothblatt & Leroy, The Motion in [Limine] in Criminal Trials: A Technique for the Pretrial Exclusion of Prejudicial Evidence, 60 Ky. L.J. 611, 623-624 (1972). Motions in limine have also been used in a number of cases, as here, to determine the admissibility of the defendant's evidence in support of a competing harms defense. See *Commonwealth* v. *Brugmann,* 13 Mass. App. Ct. 373, 374 (1982); *United States* v. *Coupez,* 603 F.2d 1347, 1350 (9th Cir. 1979); *United States* v. *Best,* 476 F. Supp. 34, 41-42, 48 (D. Colo. 1979); *State* v. *Dorsey,* 118 N.H. 844, 845 (1978); *State* v. *Olsen,* 99 Wis. 2d 572, 574-577 (1980). Cf. *Commonwealth* v. *Averill,* 12 Mass. App. Ct. 260 (1981) (necessity defense ruled unavailable at trial); *State* v. *Warshow,* 138 Vt. 22, 23 (1979) (evidence excluded after offer of proof at trial).

It is, perhaps, "more prudent for the judge to follow the traditional, and constitutionally sounder, course of waiting until all the evidence has been introduced at trial before ruling on its sufficiency to raise a proffered defense. If, at that time, the defendant has failed to produce some evidence on each element of the defense, the judge should decline to instruct on it. . . . In that event, the judge, may if appropriate, give curative instructions to caution the jury against considering evidence not properly before them" (citations omitted). *Commonwealth* v. *O'Malley*, 14 Mass. App. Ct. 314, 325 (1982).[5] See *State* v. *Quick*, 226 Kan. 308, 310-313 (1979). Cf. *Bradley* v. *Caterpillar Tractor Co.*, 75 Ill. App. 3d 890, 899-900 (1979); *Lewis* v. *Buena Vista Mut. Ins. Ass'n*, 183 N.W.2d 198, 200-201 (Iowa 1971). However, since the competing harms defense was inapplicable to the defendants' actions, they were not prejudiced by their inability to present their evidence to the jury.

Finally, the defendants argue that the jury foreman's statement shows that they were not found guilty beyond a reasonable doubt. Quite to the contrary, the statement indicated that the jury were able to separate the relevant legal

---

[5] We believe that ordinarily a judge should not allow a motion which serves to exclude, in advance of its being offered, potential evidence of the defense. Since a judge is required to instruct on any hypothesis supported by the evidence, in most instances proffer of disputed matter at trial, ruled upon in the usual course, is more likely to be fair and result in correct rulings. In emphasizing this, we do not mean to detract from our past endorsement of the practice of informal conferences between counsel and judge, before trial and during trial, for advance discussion of matters of doubtful admissibility. Cf. *Commonwealth* v. *Earltop*, 372 Mass. 199, 206 (1977) (Hennessey, C.J., concurring) (preliminary conference with judge recommended as to proposed jury argument of doubtful validity). Such a conference is certainly in order when the mere offer of evidence in open court on a controversial subject may create a prejudice to the objecting party which could not be eradicated by curative instructions to the jury. See, e.g., *Bruton* v. *United States*, 391 U.S. 123, 129 (1967). We have examined the record and conclude that evidence supporting the defense of necessity is absent and that the defendants' offers of proof do not support an instruction on the defense of necessity.

principles from the philosophical and moral questions "that transcend the scope of this trial."

*Judgments affirmed.*


LIACOS, J. (concurring). The court today appears to suggest that the allowance of a motion in limine to bar the introduction of any evidence at trial which would have substantiated a necessity defense constituted nonprejudicial error. While I agree with this conclusion, I believe that the court's reasoning sweeps too broadly.

A persuasive body of law has developed condemning the indiscriminate use of motions in limine "'to choke off a valid defense in a criminal action,' *State* v. *Quick,* 226 Kan. 308, 311 (1979), or to 'knock out' the entirety of the evidence supporting a defense before it can be heard by the jury." *Commonwealth* v. *O'Malley,* 14 Mass. App. Ct. 314, 324-325 (1982). The use of such motions to prevent the defendant from introducing "evidence on an available defense not only distorts the traditional application of motions *in limine,* but likewise raises serious constitutional questions relating to an accused's right to present a defense." *People* v. *Brumfield,* 72 Ill. App. 3d 107, 113 (1979). *Commonwealth* v. *O'Malley, supra* at 323-325. *State* v. *Bradley,* 223 Kan. 710, 713 (1978). See *People* v. *Williams,* 60 Ill. App. 3d 529 (1978); *State* v. *Warshow,* 138 Vt. 22, 29-32 (1979) (Billings, J., dissenting). Cf. *Chambers* v. *Mississippi,* 410 U.S. 284, 294-295 (1973). If the defendant's right to have his day in court is to be guaranteed, he must be given the opportunity to establish even a tenuous defense. *People* v. *Brumfield, supra. Lewis* v. *Buena Vista Mut. Ins. Ass'n,* 183 N.W.2d 198, 200-201 (Iowa 1971). See *Commonwealth* v. *O'Malley, supra.* The court accepts the validity of these principles, but fails to recognize their clear implications.

Necessity is a legally viable defense to criminal behavior. W. LaFave & A.W. Scott, Jr., Criminal Law § 50 (1972).

Once a defendant offers to prove sufficient facts to establish each element of the defense, it is reversible error to disallow evidence of necessity. *State* v. *Warshow, supra* (Billings, J., dissenting). It is irrelevant to this point whether the trial court, or this court, would find later that the defendant had not introduced sufficient evidence on each element of the defense to generate a jury question.

That the defendants should be allowed to present their defense is required by a proper respect for the role of the jury in the criminal justice system.[1] The essential purposes of the jury trial are twofold. First, the jury temper the application of strict rules of law by bringing the common sense judgment of a group of laymen to the case.[2] Second, the jury stand as a check on arbitrary enforcement of the law. "Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence." *Duncan* v. *Louisiana*, 391 U.S. 145, 156 (1968). The legitimacy of a jury verdict depends on the ability of the jury to perform these two functions.

In the instant case, however, the defendants' offer of proof fell short and satisfied only two elements of a necessity defense. They offered to prove that they were faced with a

---

[1] The importance of the jury in criminal prosecutions finds both constitutional and statutory expression. See art. 3, § 2, cl. 3, of the Constitution of the United States and the Sixth Amendment to the Constitution; *Duncan* v. *Louisiana*, 391 U.S. 145 (1968); art. 12 of the Massachusetts Declaration of Rights; and G. L. c. 263, § 6, and G. L. c. 218, § 27A. Even if the right to present evidence supporting a defense is not constitutionally required, cf. *United States* v. *Bailey*, 444 U.S. 394 (1980) (Federal law), the legislative policy of statutes providing for jury trials mandates that we protect this right, cf. *Commonwealth* v. *A Juvenile (No. 2)*, 384 Mass. 390, 392-393 (1981).

[2] As the United States Supreme Court has noted, "[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams* v. *Florida*, 399 U.S. 78, 100 (1970).

clear and imminent danger and that their actions reason-
ably could be expected to be effective.[3]  They did not offer
to prove that there was no legal alternative which would
have been effective in abating the danger, or that the Legis-
lature had not acted to preclude the defense by a clear and
deliberate choice regarding the values at issue.  Since the
defendants did not allege that they would introduce suf-
ficient evidence on each element of the defense to generate a
jury question, I agree with the court that "they were not
prejudiced by their inability to present their evidence to the
jury."  *Supra* at 595.  Had their offer of proof been suf-
ficient, they would have been entitled to present their evi-
dence to the jury, and the allowance of the motions in
limine would constitute reversible error.  *State* v. *War-
show, supra* (Billings, J., dissenting).

---

[3] In my view, the court goes too far in deciding that the defendants
"could not have reasonably expected their actions to abate the alleged
danger directly."  *Supra* at 593.