NANCY DOYLE, administratrix, *vs.* STEPHEN DONG.

No. 89-P-1286.

Middlesex. February 12, 1991. - June 21, 1991.

Present: DREBEN, JACOBS, & GREENBERG, JJ.

Further appellate review granted, 411 Mass. 1101 (1991).

*Evidence*, Hospital record, Hearsay, Medical record, Expert opinion. *Negligence*, Doctor. *Medical Malpractice*, Expert opinion.

In a medical malpractice action, the judge incorrectly allowed in evidence a hospital record containing an unsubstantiated hearsay reference to the patient's medical history [746-748]; where the admission of that evidence was not harmless, a new trial was required [748-749].

In a medical malpractice action the defendant doctor was not entitled to the admission in evidence under G. L. c. 233, §§ 78, 79, of a certain letter written by the doctor not contemporaneously but after his treatment of the patient. [749-750]

At the retrial of a medical malpractice action, if the expert opinion of the treating physician should become an issue the judge was instructed to conduct a preliminary hearing to determine the basis of its admissibility. [750]

CIVIL ACTION commenced in the Superior Court Department on January 18, 1984.

The case was tried before *Charles M. Grabau*, J.

*Elizabeth N. Mulvey* for the plaintiff.

*Timothy P. O'Neill* for the defendant.

GREENBERG, J. This action was brought in the Superior Court by Nancy Doyle (the plaintiff) as administratrix of the estate of her son, Matthew Doyle, to recover damages for his wrongful death pursuant to G. L. c. 229, § 2. The complaint alleged that the defendant's negligence in not properly diagnosing Matthew's condition and in discharging him from emergency hospital care resulted in his conscious suffering and death. The case was tried to a jury beginning on November 4, 1987. On November 17, 1987, the jury returned a spe-

cial verdict for the defendant. The plaintiff now claims that the trial judge committed error in the admission of certain evidence: (1) hospital records containing hearsay information under G. L. c. 233, § 79; (2) a letter written by the defendant to his corporate employer after Matthew was transferred to another hospital; and (3) testimony of Matthew's pediatrician relating to notes made during a morbidity and mortality conference at Children's Hospital. We reverse the judgment.

The relevant facts are as follows. On June 21, 1983, when Matthew was fourteen months old, he awoke at approximately 9 P.M. with a fever. As the night wore on, his breathing became labored, and the plaintiff testified that later in the evening she heard a "clicking" noise emanating from his chest. Because of his agitation, she decided to take him to Sancta Maria Hospital, less than four miles from their home. Upon Matthew's arrival at the emergency room at 4:15 A.M., the nurse on duty obtained a history, noting in the record her own observation that Matthew was feverish, had "mild inspiratory stridor"[1] and was generally uncomfortable. Next, Matthew was examined by the defendant, a specialist in internal (adult) medicine, who was employed part-time by Atlantic Medical Associates, at the emergency service at Sancta Maria. There was conflicting testimony as to whether the medical sign of mild inspiratory stridor was reported to the defendant at this time. Attempting a throat examination, the defendant used a pen light as a tongue depressor, but Matthew instinctively pulled away and would not open his mouth. The defendant ordered a chest X-ray and a blood test which later demonstrated a markedly elevated white blood cell count. He called Matthew's pediatrician, Dr. Samuel Andonian, to report the initial results of his examination and to solicit his advice concerning the administration of antibiot-

---

[1]Laryngeal stridor, usually associated with inspiration, is manifested by a hoarse "crowing" sound. There was expert testimony to the effect that persisting stridor is a physical finding suggestive of some airway obstruction which may involve an enlargement of the epiglottis. This definition and those referred to in notes 2, 3, and 4 *infra*, are taken from Nelson, Textbook of Pediatrics (1987).

ics. Satisfied that Matthew had an early viral syndrome and that his pediatrician would follow with an examination later that day, the defendant discharged him at 5:45 A.M. The diagnosis recorded by the defendant in the Sancta Maria record was "[f]ever — prob[ably] early viral syndrome."

Matthew was next examined at the emergency department of Symmes Hospital in Arlington at 10:45 A.M. on the same day. The plaintiff, preparing to leave for the pediatrician's office, had noticed that Matthew had stopped breathing and sought immediate emergency care at this nearby facility. The Symmes emergency care staff, headed by Dr. James Campbell, called an emergency code and attempted to resuscitate him by intubation performed by an anesthesiologist, Dr. Chal Kwon. Noted in Symmes' hospital record contemporaneous with this procedure is a diagnosis of respiratory arrest, with a possibility of sepsis.[2] The sketchy notes of the physical examination, prepared just before emergency transfer to Children's Hospital in Boston, do not mention any abnormality associated with his epiglottis. As soon as his vital signs were stabilized, Matthew was transported by an emergency team to the intensive care unit at Children's Hospital. After three days in a coma, Matthew's condition deteriorated, and he died on June 25, 1983. According to all of the expert testimony, the immediate cause of death was an inability to breathe brought on by epiglottitis.[3]

Dr. Richard Stone, a pediatrician, testified as an expert on the plaintiff's behalf. The sum of his testimony was that, based upon reasonable medical probability, Matthew's rapidly progressing and eventually fatal condition could have been avoided had the defendant made a timely and proper diagnosis of epiglottitis. He expressed the opinion that, given the history, physical examination and laboratory findings at Sancta Maria Hospital, the defendant should have consid-

---

[2]Sepsis is poisoning caused by the absorption into the bloodstream of pathogenic organisms.

[3]The medical term epiglottitis refers to a relatively rare condition. Its onset is sudden and is marked by sore throat, fever, prostration, redness, swelling of the epiglottis, and difficulty in breathing.

ered epiglottitis as a priority in his diagnosis. There was testimony from physicians called by both parties that one of the classic signs of epiglottitis is redness and swelling of the epiglottis, sometimes detected through pharyngeal examination, X-ray, or visualization through a laryngoscope.[4] The plaintiff's expert faulted the defendant for his failure, in view of the blood tests later showing a bacterial process characteristic of this condition, to consider the possibility of epiglottitis and to transfer Matthew immediately to a specialized acute care facility like Children's Hospital. He opined that the defendant's treatment fell below the expected standard of care at the time for an emergency service internist.

The defendant countered that none of the plaintiff's witnesses established that Matthew had any focal signs, especially a red and swollen epiglottis, which would have required that epiglottitis be considered as part of the differential diagnosis. One defense expert, Dr. Daniel C. Shannon, testified as to the rare and rapidly progressing nature of this disease. He stated that precise staging of Matthew's condition was difficult at best, and the lack of any focal signs during physical examination by the defendant justified his initial diagnosis of early viral syndrome.[5]

1. *The "normal" epiglottis evidence.* Prior to trial, the plaintiff filed a motion in limine which sought the exclusion of certain evidence. The primary matter disputed was an unsubstantiated reference in the Children's hospital record (discharge summary and progress notes) made by Dr. Louis Rubin describing Matthew's epiglottis as "normal" while he was at Symmes Hospital. The judge prudently declined to rule on the plaintiff's motion, preferring that counsel develop the matter fully at trial. *Commonwealth* v. *Hood*, 389 Mass. 581, 595 (1983). *Commonwealth* v. *Barber*, 14 Mass. App. Ct. 1008, 1010-1011 (1982). Subsequently, on the third day

---

[4] A laryngoscopy is a diagnostic technique in which a scope is inserted into the throat for purposes of examination of the larynx and surrounding structures.

[5] His testimony was apparently based on the assumption that the defendant initially examined Matthew prior to the onset of the constellation of specific signs mentioned in note 3, *supra*.

Doyle *v.* Dong.

of trial, and immediately before the cross-examination of Dr. Stone (the plaintiff's expert), the judge denied the plaintiff's motion to exclude Dr. Rubin's handwritten note in the Children's hospital record which referred to a throat culture done at Symmes indicating an impression of a normal epiglottis.[6] The plaintiff's objection was timely recorded.

General Laws c. 233, § 79, renders hospital records admissible because of the presumption of reliability arising from their use in a medical setting.[7] See *Commonwealth* v. *Bohannon*, 385 Mass. 733, 750 (1982). The standard to be applied is much influenced by *Bouchie* v. *Murray*, 376 Mass. 524 (1978), where it was suggested (in dictum) that statements as to medical history based on personal knowledge of the declarant may be admissible even if the declarant is not the patient. The court, however, indicated that for a document to fall within the medical records exception to G. L. c. 233, § 79, "the information must be recorded from the personal knowledge of the entrant or from a compilation of the personal knowledge of those who are under a medical obligation to transmit such information." *Id.* at 531. "[S]econd level hearsay . . . is not rendered admissible by the medical records exception." *Id.* at 527.

The *Bouchie* case criteria were not met here. During numerous conferences with counsel, the judge questioned the source of Dr. Rubin's note which was never explained.[8] Because the Children's Hospital statement that the epiglottis

---

[6]Earlier, over the plaintiff's objection, the judge permitted the defendant to offer the entire Children's hospital record, having excised the discharge summary part relating the Symmes history.

[7]This statutory exception to the hearsay rule permits introduction in evidence of properly authenticated hospital records in the discretion of the court, "so far as such records relate to the treatment and medical history . . .; but nothing therein contained shall be admissible as evidence which has reference to the question of liability." See G. L. c. 233, § 79, as appearing in St. 1959, § 200.

[8]Dr. Campbell, the attending physician at Symmes, later testified concerning the note that "I did not give any information to anyone at Children's Hospital . . . nor did I speak to any medical intern from Children's Hospital about the epiglottis being normal." Dr. Kwon, who actually performed the intubation procedure, could not recall his observations of Matthew's epiglottis.

was normal while at Symmes was not evidence within the purview of the statute,[9] the judge allowed a substantial hearsay violation hidden beneath the guise of a hospital record. See, e.g., *Commonwealth* v. *Baldwin*, 24 Mass. App. Ct. 200, 201-202 (1987). Consequently, we conclude that the admission of Dr. Rubin's note was erroneous.

We come to the close question whether the erroneously admitted evidence "injuriously affected the substantial rights" of the plaintiff. See G. L. c. 231, §§ 119, 132. We conclude that it did and that the plaintiff is entitled to a new trial. *Ibid. Sacco* v. *Roupenian*, 409 Mass. 25, 30 (1991). Dr. Stone, the plaintiff's expert, testified that, in all the cases of epiglottitis that he has treated, visualization by laryngoscopy has always shown a red and swollen epiglottis. Dr. Rubin's note was the only evidence which directly contradicted the plaintiff's central allegation — that Matthew exhibited classic warning signs of epiglottitis at an early stage. Using the improperly admitted note, the defendant could lead the jury to believe that if the epiglottis was "normal" at Symmes Hospital then it must have been such earlier at the time of the defendant's examination of Matthew.[10] Indeed, defense counsel argued in favor of admission as follows: "[Y]our Honor, it certainly is a crucial issue because if this one reference in the historical information that is listed by many phy-

---

[9]As an aside, we suggest that the defendant, as the proponent of the information, had the burden of showing that Dr. Rubin's sources carried "the same indicia of reliability, arising from regularity and . . . motives, that bring his own act of recording the information within the statutory exception." See *Commonwealth* v. *McDonough*, 400 Mass. 639, 643 n.8 (1987).

[10]Defense counsel used the improperly admitted note to (a) vigorously cross-examine the plaintiff's expert, Dr. Stone, as to his opinion on the defendant's standard of care; (b) buttress the defendant's own testimony concerning Matthew's condition at the time of the relevant examination; and (c) drive home during his closing argument the fact that the epiglottis was apparently "normal" at Symmes Hospital. Finally, and perhaps most significantly, the jury took with them into their deliberations the Children's hospital record, a written document with an "[inherent] aura of officialdom," see *Kelly* v. *O'Neil*, 1 Mass. App. Ct. 313, 317 (1973), which they could study. See, e.g., *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 407 (1982).

sicians at Children's is excised you are cutting out the heart of the defense of Dr. Dong." Because the note was the only evidence that the epiglottis was normal and not red and swollen, and because the defense employed the damaging notation often and to effect, we cannot say that its admission was harmless. *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 407 (1982). *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 275 (1990). *Wright* v. *American Precast Concrete*, 19 Mass. App. Ct. 1014, 1016 (1985).

2. We comment on the issues which may arise at retrial.

a. *The post-treatment letter.* On the day following Matthew's discharge from Sancta Maria Hospital, June 23, 1983, the defendant wrote a letter to Dr. Joseph Maloney, a director of the defendant's corporate employer, Atlantic Medical Associates, recounting his telephone conversation with Matthew's pediatrician, Dr. Andonian. At trial, the defendant acknowledged that he wrote the letter at Dr. Maloney's request after being informed that Matthew was in critical condition at Children's Hospital. This letter was at some point incorporated into the Sancta Maria hospital record.

The plaintiff, as part of her motion in limine, sought to exclude the letter, arguing that, because it was not composed contemporaneously with treatment, it was no more than a contrivance to show Dr. Andonian's support of the initial diagnosis. The letter refers to various signs which appeared during Matthew's initial examination as well as Dr. Andonian's responses upon being apprised of the symptoms. In its cross-examination of Dr. Andonian, the defense aimed to shift blame from the defendant to him for not intervening with alacrity to diagnose Matthew's condition properly.[11] Plaintiff's counsel used the document to impeach the defendant.

We agree with the plaintiff that the defendant was not entitled to admission of the letter under G. L. c. 233, §§ 78, 79. See and contrast *Wiik* v. *Rathore*, 21 Mass. App. Ct.

---

[11]The letter stated, in part, "[I] did also mention the possibility of croup to him, although it was not a high clinical possibility at the time based on the absence of respiratory distress, stridor and 'barking' cough."

399, 401-402 (1986) (plaintiff was proponent of evidence and sought full probative effect of post-operative entry; entry held admissible only as a prior inconsistent statement bearing on credibility). That the plaintiff could have the letter admitted (for limited purposes) does not help the defendant.

b. *Dr. Andonian's morbidity conference notations.* Dr. Andonian was called by the plaintiff to give his testimony as a treating physician. Midway through direct examination, the plaintiff opted to treat him as an expert on the diagnosis of epiglottitis. The riskiness of this tactic became apparent when, over the plaintiff's objection, the defendant was permitted to cross-examine Dr. Andonian about his notations made during a physician's meeting at Children's Hospital months after Matthew's death. The plaintiff's counsel objected, in particular, to Dr. Andonian's opinion as to the "rarity of the condition [epiglottitis]." In *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 527-531 (1986), the Supreme Judicial Court took a modest step in enlarging the basis for expert opinion. See also Proposed Mass.R.Evid. 703. An expert may base his opinion on hearsay information so long as the facts are independently admissible and form a permissible basis for the opinion. Should Dr. Andonian's diagnostic opinion become the subject of his testimony at any retrial, the judge should conduct a preliminary voir dire inquiry to determine whether his recordings were part of the underlying factual basis upon which his opinion rested, and, as such, independently admissible. *Henderson* v. *D'Annolfo,* 15 Mass. App. Ct. 413, 430 (1983).

*Judgment reversed.*