COMMONWEALTH *vs.* HARRY W. LENO, JR., & another.[1]

Essex. May 6, 1993. - July 15, 1993.

Present: LIACOS. C.J.. WILKINS. ABRAMS. NOLAN. & LYNCH. JJ.

*Necessity. Controlled Substances. Acquired Immunodeficiency Syndrome. Practice, Criminal*, Instructions to jury.

At the trial of complaints for unauthorized possession and unlawful distribution of hypodermic needles and syringes, the defendants, who conducted a needle exchange program in an effort to combat the spread of acquired immunodeficiency syndrome (AIDS), were not entitled to a jury instruction on the defense of necessity where there was no evidence that the danger they sought to avoid was clear and imminent and that there was no legal alternative effective in abating the danger. [839-841] LIACOS, C.J., concurring.

This court rejected the contention that criminal defendants are entitled to an instruction on jury nullification. [842]

COMPLAINTS received and sworn to in the Lynn Division of the District Court Department on June 20, 1991.

In the jury session of the Peabody Division, the cases were tried before *Robert E. Hayes*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Harvey A. Schwartz (Sarah R. Wunsch* with him) for Robert E. Ingalls.

*Daniel Beck* for Harry W. Leno, Jr.

*Margaret J. Perry*, Assistant District Attorney (*Mark S. Weber*, Assistant District Attorney, with her) for the Commonwealth.

*Benjamin H. Keehn*, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

---

[1]Robert E. Ingalls.

*Michael T. Isbell*, of New York, & *William Garza*, for Coalition of Addiction, Pregnancy, and Parenting & others, amici curiae, submitted a brief.

ABRAMS, J. Massachusetts is one of ten States that prohibit distribution of hypodermic needles without a prescription.[2] G. L. c. 94C, §§ 27, 38 (1990 ed.). In the face of those statutes the defendants operated a needle exchange program in an effort to combat the spread of acquired immunodeficiency syndrome (AIDS). As a result, the defendants were charged with and convicted of (1) unauthorized possession of instruments to administer controlled substances, and (2) unlawful distribution of an instrument to administer controlled substances, in violation of G. L. c. 94C, § 27 (1990 ed.). On appeal, the defendants challenge the judge's refusal to instruct the jury on the defense of necessity. We allowed the defendants' application for direct appellate review. We affirm.

We set forth the relevant facts. In June, 1991, the defendants were arrested and charged with sixty-five counts of unauthorized possession of hypodermic needles and fifty-two counts of unauthorized possession of syringes.[3] Each defendant also was charged with one count of distributing an instrument for the administration of a controlled substance.[4] The defendants told the police they were exchanging clean syringes and needles for dirty, possibly contaminated, ones to prevent the spread of AIDS.

---

[2]At the time of trial, Connecticut also required a prescription; since then, the Connecticut Legislature removed the prescription requirement.

[3]The police testified that the area where the defendants were arrested was a "high drug area" where the police found discarded hypodermic needles and syringes.

[4]The police also confiscated several plastic bleach bottles filled with used, dirty syringes and needles. The police, fearing contracting AIDS by touching or counting these instruments, did not charge the defendants with possession of them. The police seized a number of packets containing information on drug treatment centers, the spread of AIDS, the sterilization of needles, and the hazards of sharing needles; the police also seized packages of condoms and small bottles of bleach and of water. The defendants were distributing these items along with clean needles.

Defendant Leno is a fifty-five year old grandfather, who had been addicted to alcohol, cocaine, heroin, or various pills from age twelve to forty-five. At the time of trial, he was in his tenth year of recovery from addiction; his health insurance covered his treatment. Leno learned of needle exchange programs from a National AIDS Brigade lecturer. Leno worked for needle exchange programs in Boston, in New Haven, Connecticut, and in New York City. Leno started a needle exchange program in Lynn in September, 1990, after realizing that "in my own back yard . . . people were dying of AIDS . . . and this particular service was not offered to them." Leno testified that he believed that by providing clean needles to addicts he was helping to stem the spread of AIDS, he was helping addicts, especially the homeless, to reach recovery, and that he was not helping addicts continue their habit.

Defendant Robert Ingalls said that he is fifty-three years old and works as a landscaper. He joined Leno in operating a needle exchange program in Lynn as a matter of conscience: "I would have had a hard time with my conscience if I didn't do it without good reason. I [knew] people were dying of AIDS . . . and when [Leno] told me what he was doing, I thought well, maybe, you could save a few lives. . . . [I]t's sort of an irresistible opportunity for me, if you can save a life."

The two defendants legally purchased new sterile needles over-the-counter in Vermont. The defendants were at a specific location on Union Street in Lynn from 5 P.M. to 7 P.M. every Wednesday evening in 1991 until they were arrested June 19. They accepted dirty needles in exchange for clean needles; they exchanged between 150 and 200 needles each night, for fifty to sixty people. The defendants did not charge for the service or for the materials.

The defendants offered expert testimony on AIDS and needle exchange programs. Doctor Ernest Drucker of the Montefiore Medical Center in the Bronx, who is also a professor of epidemiology at Einstein College of Medicine and an authority on the treatment of drug users and the relation-

ship between intravenous drug use and AIDS, stated that: the sharing of needles by infected drug users transmits the AIDS virus; the mortality rate of persons diagnosed with human immunodeficiency virus (HIV) ten years ago is very high, in that fewer than five per cent still are alive; there is no cure for AIDS; studies of needle exchange programs revealed no evidence that such programs cause people who are not drug addicts to become addicts, but that evidence indicates that needle exchange programs bring some addicts into drug and AIDS treatment programs who would not otherwise be there; he could not think of any harmful effects caused by needle exchange programs, and no studies found harmful effects; needle exchange programs save lives; and AIDS accounts for three times as many deaths as all other drug-related causes, such as overdosing, combined.

Elaine O'Keefe, director of the AIDS Division of the New Haven (Connecticut) health department, which has run a needle exchange program for several years, said that the program has shown only positive results. She noted that: a Yale University research study found that the program had significantly reduced needle sharing and produced an estimated reduction of 33% in incidence of new infections among program participants; at the beginning of the program about 60% of the needles turned in were contaminated by the HIV virus, but that percentage decreased dramatically over time, leading O'Keefe to conclude that the program had reduced the risk of infection; the needle exchange program is saving the lives of "[d]rug users, sexual partners, mostly women, and children who are born of them."

Kathleen Gallagher, director of the AIDS surveillance program of the Massachusetts Department of Public Health, testified that AIDS is a very serious epidemic in Massachusetts and elsewhere, that the AIDS fatality rate is "essentially 100%," that so far more than 5,000 people in Massachusetts were diagnosed as having AIDS, and that many more are infected by HIV but are still asymptomatic. In 1991, 31% of new AIDS cases were intravenous drug users. When sexual partners and children were included, 38% of

AIDS cases were associated with intravenous drug use. Fifty percent of Massachusetts women with AIDS contracted the disease through intravenous drug use.

Brian Condron, research director for the Massachusetts Legislature's joint committee on health care, stated that the Legislature had considered repeal of the prescription requirement and needle exchange legislation for several years, with different branches and committees giving approval of some of the bills at different times. The Legislature had not repealed the prescription requirement by the time of trial.

*Discussion.* The defendants do not deny that they violated the provisions of the statutes restricting the possession and distribution of hypodermic needles; rather, they contend that the judge's refusal to instruct the jury on the defense of necessity was error. We disagree.

"[T]he application of the defense [of necessity] is limited to the following circumstances: (1) the defendant is faced with a clear and imminent danger, not one which is debatable or speculative; (2) the defendant can reasonably expect that his [or her] action will be effective as the direct cause of abating the danger; (3) there is [no] legal alternative which will be effective in abating the danger; and (4) the Legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue."[5] *Commonwealth* v. *Schuchardt*, 408 Mass. 347, 349 (1990), quoting *Commonwealth* v. *Brugmann*, 13 Mass. App. Ct. 373, 379 (1982). "A defendant is entitled to an instruction on necessity 'only if there is evidence that would warrant a reasonable doubt whether [the defendant's actions were] justified as a choice between evils.'" *Schuchardt, supra* at 349, quoting *Brugmann, supra* at 379. We have emphasized that a person asserting the necessity defense must demonstrate that the danger motivating his or her unlawful conduct is imminent, and that he or she acted out of necessity at all times that he

---

[5]In denying the defendants' request for an instruction on necessity, the judge determined that "the [L]egislature has considered this particular issue and is apparently still considering this issue. . . . [I]f there is a change, it should be undertaken by the [L]egislature."

or she engaged in the unlawful conduct. *Commonwealth* v. *Lindsey*, 396 Mass. 840 (1986). The analysis of whether a danger is imminent does not call for a comparison of competing harms. *Commonwealth* v. *Hutchins*, 410 Mass. 726, 731 (1991).[6]

The defense of justification by necessity is not applicable unless a person is "faced with a clear and imminent danger, not one which is debatable or speculative." *Commonwealth* v. *Schuchardt, supra* at 549. "[T]he 'competing harms' defense exonerates one who commits a crime under the 'pressure of circumstances' . . . ." *Commonwealth* v. *Hutchins, supra* at 730, quoting *Brugmann, supra* at 376-377.

The prevention of possible future harm does not excuse a current systematic violation of the law in anticipation of the eventual over-all benefit to the public. See, e.g., *Commonwealth* v. *Lindsey, supra* at 845-846 (when evidence does not raise reasonable doubt whether defendant was acting out of necessity at all times when violating statute prohibiting carrying firearm, even if defendant did so in response to a serious and specific threat, no instruction on necessity required). The defendants did not show that the danger they sought to avoid was clear and imminent, rather than debatable or speculative. See *Schuchardt, supra* at 349; *Commonwealth* v. *Hood*, 389 Mass. 581, 591 (1983); *Brugmann, supra* at 379. The defense of necessity "[does] not deal with nonimminent or debatable harms . . . [it is inapplicable when] the hazards are long term, [and] the danger is not imminent." *Brugmann, supra* at 378, quoting *State* v. *Dorsey*, 118 N.H. 844, 846 (1978), and *State* v. *Warshow*, 138 Vt. 22, 25 (1979). That some States prohibit the distribution of hypo-

---

[6]On appeal, the parties limit their arguments to the issue whether an instruction on necessity was required; we also limit our consideration to that issue. Therefore, we assume without deciding that the defendants showed that "the harm that would have resulted from compliance with the law significantly outweighs the harm that reasonably could result from the court's acceptance of necessity as an excuse in the circumstances presented by the particular case." *Commonwealth* v. *Hutchins*, 410 Mass. 726, 730-731 (1991).

dermic needles without a prescription, and others do not,[7] merely indicates that the best course to take to address the long-term hazard of the spread of AIDS remains a matter of debate.

The defendants' argument is that, in their view, the prescription requirement for possession and distribution of hypodermic needles and syringes is both ineffective and dangerous. The Legislature, however, has determined that it wants to control the distribution of drug-related paraphernalia and their use in the consumption of illicit drugs. That public policy is entitled to deference by courts. Whether a statute is wise or effective is not within the province of courts. *Commonwealth* v. *Lammi*, 386 Mass. 299, 300 (1982). "It is not for this court to judge the wisdom of legislation or to seek to rewrite the clear intention expressed by the statute." *Mellor* v. *Berman*, 390 Mass. 275, 283 (1983). "Our deference to legislative judgments reflects neither an abdication of nor unwillingness to perform the judicial role; but rather a recognition of the separation of powers and the 'undesirability of the judiciary substituting its notions of correct policy for that of a popularly elected Legislature.'" *Lammi, supra* at 300, quoting *Zayre Corp.* v. *Attorney Gen.*, 372 Mass. 423, 433 (1977).

Citizens who disagree with the Legislature's determination of policy are not without remedies. "[T]he popular initiative is coextensive with the Legislature's law-making power under Part II, c. 1, § 1 . . . ." *Paisner* v. *Attorney Gen.*, 390 Mass. 593, 601 (1983). See also Mass. Const. Pt. I, art. 19 (the right of people to petition the Legislature). Thus, the defendants did not meet the requirement that there be no legal alternative to abate the danger.

---

[7]The defendants' reliance on *Spokane County Health Dist.* v. *Brockett*, 120 Wash. 2d 140 (1992), is misplaced. That case did not consider the defense of necessity. In *Spokane*, the Supreme Court of the State of Washington held that the Washington Legislature's broad grant of authority to local health officials exempted them from criminal statutes prohibiting hypodermic needle distribution. The defendants here did not have such authorizing legislation.

The defendants argue that the increasing number of AIDS cases constitutes a societal problem of great proportions, and that their actions were an effective means of reducing the magnitude of that problem; they assert that their possession, transportation and distribution of hypodermic needles eventually will produce an over-all reduction in the spread of HIV and in the future incidence of AIDS. The defendants' argument raises the issue of jury nullification, not the defense of necessity. We decline to require an instruction on jury nullification. "We recognize that jurors may return verdicts which do not comport with the judge's instructions. We do not accept the premise that jurors have a right to nullify the law on which they are instructed by the judge, or that the judge must inform them of their power. See *Commonwealth* v. *Hebert*, 379 Mass. 752 (1980); *Commonwealth* v. *Ferreira*, 373 Mass. 116 (1977)." *Commonwealth* v. *Fernette*, 398 Mass. 658, 670-671 n.23 (1986).

*Judgments affirmed.*


LIACOS, C.J. (concurring). I agree with the court that the judge was not required to instruct the jury on the defense of necessity. I write separately for two reasons.

First, I reiterate my concern (not implicated by the facts of this case) that evidence of necessity not be excluded by a motion in limine once a defendant has made a sufficient offer of proof. See *Commonwealth* v. *Brogan, ante* 169, 179 (1993) (Liacos, C.J., concurring); *Commonwealth* v. *Hood*, 389 Mass. 581, 596 (1983) (Liacos, J., concurring). Even though a defendant ultimately may not be entitled to an instruction on the necessity defense, the presentation of evidence regarding necessity allows the jury to fulfil their vital functions of "temper[ing] the application of strict rules of law by bringing the common sense judgment of a group of laymen to the case [and] stand[ing] as a check on arbitrary enforcement of the law" (footnote omitted). *Commonwealth* v. *Hood, supra* at 597 (Liacos, J., concurring).

Second, although the harm at issue here is "nonimminent" and "debatable" for purposes of the defense of necessity, the overwhelming and uncontroverted expert evidence presented at trial describing the effectiveness of needle exchange programs in curbing the spread of AIDS will, I hope, indicate to the Legislature the importance of joining the vast majority of jurisdictions that have decriminalized possession and distribution of hypodermic syringes. In the words of Dean Roscoe Pound: "Law must be stable, and yet it cannot stand still." R. Pound, Interpretations of Legal History 1 (1923).