COMMONWEALTH vs. JEB E. BRUGMANN & others.[1]

Franklin. February 16, 1982. — April 1, 1982.

Present: ARMSTRONG, GREANEY, & SMITH, JJ.

*Trespass. Necessity. Self-Defense. Defense of Others.*

Discussion of the principle of competing harms, as a branch of the doc-
trine of necessity, with reference to its applicability to the defendant in
a criminal case. [376-379]
Although this court assumed that a claim of necessity would be available
to a criminal defendant in appropriate circumstances, the issue of ne-
cessity was not fairly raised at the trial of complaints charging crimi-
nal trespass at a nuclear power plant where the defendants, who had
occupied a restricted area of the plant and attempted to cause it to shut
down, did not demonstrate that they had made themselves aware of
alternative means of abating an apprehended danger from nuclear
radiation and either had pursued those which were lawful, or had
found lawful means to be futile in the circumstances. [379-382]
Claims of self-defense or defense of others, based upon an apprehended
danger from nuclear radiation, were not applicable to defendants
charged with criminal trespass as the result of their occupying a re-
stricted area of a nuclear power plant in an attempt to cause the plant
to shut down. [382-383]

COMPLAINTS received and sworn to in the Franklin Divi-
sion of the District Court Department on June 4, 1979.

The cases were heard by *Apkin, J.*

*Thomas Lesser* (*William C. Newman* with him) for the
defendants.

*Stephen R. Kaplan,* Assistant District Attorney, for the
Commonwealth.

*John F. Sherman, III,* for Yankee Atomic Electric Com-
pany, amicus curiae, submitted a brief.

---

[1] Peter K. Bergen, Andre W. Brainard, George C. Combs, Daniella
Liebling, Edna F. McGlynn, Eileen P. Murray, David P. Detmold, Kris-
ten Nelson, Alan G. Surprenant and Anne Pittman.

GREANEY, J.   The defendants were convicted of criminal trespass under G. L. c. 266, § 120, for occupying a restricted area at a nuclear power plant. The question presented is whether the trial judge erred in ruling that the defenses of necessity, self-defense and defense of others were not available at their trial. We hold that the ruling was correct and affirm the convictions.

On June 2, 1979, twenty-one persons, including the eleven defendants, walked past a barrier and sat down against the main gate by a fence at the Yankee Atomic Electric Company nuclear power plant in Rowe. The protestors apparently knew, and the plant superintendent later testified, that a regulation of the United States Nuclear Regulatory Commission (NRC) requires the plant to shut down if unauthorized people remain within twenty feet of its fence for any significant length of time. When the plant superintendent advised the defendants that they would have to move, they refused. A State police officer also requested that they leave the area. When they refused the officer's request, they were arrested and charged with trespass.

Prior to trial, the defendants advised the judge that they had occupied the area near the fence, and sought to force the plant to shut down, because of the hazards it presented to people in the vicinity. The defendants also expressed a belief that their action was justified under that branch of the necessity doctrine known as the "competing harms" defense,[2] or as action taken in defense of themselves or others.

---

[2] The defense has been formulated by one commentator in the following terms: "The pressure of natural physical forces sometimes confronts a person in an emergency with a choice of two evils: either he may violate the literal terms of the criminal law and thus produce a harmful result, or he may comply with those terms and thus produce a greater or equal or lesser amount of harm. For reasons of social policy, if the harm which will result from compliance with the law is greater than that which will result from violation of it, he is justified in violating it. Under such circumstances he is said to have the defense of necessity, and he is not guilty of the crime in question — unless, perhaps, he was at fault in bringing about the emergency situation, in which case he may be guilty of a crime of which that fault is an element." LaFave & Scott, Criminal Law § 50, at 381 (1972).

In response to a Commonwealth motion for a pretrial ruling on the availability of the defenses, the judge, after an offer of proof and argument by the defendants (who appeared pro se) ruled that the defenses were not available. Subsequently, the judge allowed a voir dire, at which he heard the testimony of two experts offered by the defendants. At the conclusion of the voir dire, however, he excluded their testimony, apparently ruling that the evidence was insufficient as matter of law to raise the defenses stated.[3] We summarize the relevant evidence offered by the defendants.

Dr. Ernest J. Sternglass is a qualified expert on the effects of nuclear radiation. He testified that, on the day of the trespasses, radiation was escaping from the Rowe plant and was appearing in the area around the plant at levels which equaled or exceeded that of fallout from the testing of nuclear weapons. He stated that radiation at these levels caused an increased incidence of cancer and also significantly heightened mortality. He also testified that the plant's operating reports for 1977 and 1978 revealed failures of the fuel cladding around the uranium in the reactor, of the steam tubing, and of the radiation monitoring system, all of which led to serious radiation leakage, at levels exceeding those permitted under standards established by the United States Environmental Protection Agency. He further stated that part of this radiation escaped in the form of strontium 90, which settles into the soil and water. Finally, he indicated that people who consume fish, animals, milk, water, vegetables or other produce contaminated by strontium 90 are exposed to possible damage of the bone marrow and white blood cells, and an increased risk of leukemia, infant mortality and congenital defects.

Dr. Rosalie Bertell, a qualified cancer research scientist, testified that the plant's annual reports indicated that radia-

---

[3] It is not entirely clear from the record what the judge considered at the time of the hearing on the pretrial motion. It is reasonably clear that at the conclusion of the voir dire of the defendants' experts, the judge had before him the defendants' complete offer of proof, together with memoranda of law which outlined the contentions of the parties and the elements of the defenses, including the "competing harms" defense.

tion was being released in levels sufficiently high to pollute the air, water and food in the Rowe area. She testified that on the day of the alleged trespasses, people breathing the air, drinking the water, or eating the food around Yankee Atomic were receiving a potentially harmful dosage of radiation. She also testified that it was impossible to anyone living near the plant to test the level of his radiation intake, or to prevent that intake.

The defendants indicated in their memorandum that they had filed petitions across the country "on behalf of safe energy and an end to nuclear pollution," that they had lobbied in Congress towards similar ends, that they had written letters to the NRC regarding the hazards of nuclear power, and that they had brought their concerns about the alleged antiquated design and obsolete safety features of Yankee Atomic to the attention of the plant superintendent. Their memorandum also referred to "a show cause suit against Yankee Rowe in 1974, asking that the plant be shut down," filed by an antinuclear organization with which the defendants are associated. The memorandum further stated that such organizations "have been frustrated in their efforts to rectify the existing harms of commercial nuclear power . . . through legislative channels."[4]

1. *Competing harms.* In essence, the "competing harms" defense[5] exonerates one who commits a crime under the

[4] Although the trial judge excluded the expert testimony offered by the defendants, he apparently permitted them, at trial, to explain their reasons for occupying the restricted area, and to testify about their efforts to obtain redress with respect to the hazards alleged to exist at the Rowe plant.

[5] The Proposed Criminal Code of Massachusetts recommends the adoption of this defense based on the formulation in the Model Penal Code § 3.02 (1962). The proposed G. L. c. 263, § 40, reads as follows:

"(a) Conduct is justified if it is necessary to avoid a harm, provided that:

(1) the harm sought to be avoided by such conduct is clearly greater than that sought to be prevented by the law defining the offense charged;

(2) neither this code nor any other statute defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification does not otherwise plainly appear.

(b) When the defendant was reckless or criminally negligent in bringing about the situation requiring a choice of harms or in appraising the

"pressure of circumstances" if the harm that would have resulted from compliance with the law significantly exceeds the harm actually resulting from the defendant's violation of the law. At its root is an appreciation that there may be circumstances where the value protected by the law is, as a matter of public policy, eclipsed by a superseding value which makes it inappropriate and unjust to apply the usual criminal rule. See generally LaFave & Scott, Criminal Law § 50 (1972); Arnolds & Garland, The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil, 65 J. Crim. L. & Criminology 289, 291-296 (1974).

"We have long recognized that compulsion may negate criminal purpose." *Commonwealth* v. *Thurber,* 383 Mass. 328, 330 (1981) (prison escape), citing *Commonwealth* v. *Elwell,* 2 Met. 190, 192 (1840). We have recently considered the defense of "necessity" in connection with another group of criminal trespasses at a nuclear power plant. In that case, we concluded that the defense did not apply because the facts failed to show either the existence of an immediate danger or any reasonable expectation that the acts of trespass would have any "immediate consequences" in reducing such a danger. *Commonwealth* v. *Averill,* 12 Mass. App. Ct. 260, 262 (1981). There, however, we dealt with an informational protest on the general dangers of nuclear power, whereas here we deal with a protest directed at bringing an immediate end to what was, in the opinion of the defendants' experts, an emergency situation. For that reason, we agree with the defendants that *Averill* is different both in fact and in law from the present situation. Moreover, apart from that case and the *Thurber* case, *supra,* the "competing harms" defense does not appear to have any analogue in Massachusetts statutes or case law. Thus, until

necessity for his conduct, the justification provided in paragraph (a) does not apply in a prosecution for an offense for which recklessness or criminal negligence, as the case may be, suffices to establish culpability."

now, we have not directly considered the application of this defense in the present context.

The defense has been asserted in cases involving trespasses at nuclear plants in other jurisdictions, but singularly without success. In *State* v. *Dorsey,* 118 N.H. 844 (1978), the defense (recognized by New Hampshire statute) was rejected on facts similar to those in *Averill,* on the ground that it "[does] not deal with nonimminent or debatable harms; nor [does] it deal with activities that the legislative branch of government [has] expressly sanctioned and found not to be harms." *Id.* at 846. For New Hampshire cases following *Dorsey,* see *State* v. *Koski,* 120 N.H. 112, 114-115 (1980); *State* v. *Weitzman,* 121 N.H. 83, 88-89 (1981). In *State* v. *Warshow,* 138 Vt. 22 (1979), the defense was held inapplicable to a trespass committed during a protest directed at low level radiation, nuclear waste, and the possibility of a nuclear accident, on the ground that "the hazards are long term, [and] the danger is not imminent." [6] *Id.* at 25. See Antinuclear Demonstrations and the Necessity Defense: *State* v. *Warshow,* 5 Vt. L. Rev. 103 (1980). The same result has been reached in other cases involving trespasses at nuclear power plants. See *United States* v. *Best,* 476 F. Supp. 34, 42-49 (D. Colo. 1979); *State* v. *Greene,* 5 Kan. App. 2d 698, 700-702 (1981); *State* v. *Kee,* 398 A.2d 384, 385-386 (Me. 1979); *People* v. *Chachere,* 104 Misc. 2d 521, 522-526 (N.Y. Sup. Ct. 1980). See also *State* v. *Marley,* 54 Haw. 450, 471-473 (1973) (trespass at plant manufacturing antipersonnel weapons); *State* v. *Olsen,* 99 Wis. 2d 572,

---

[6] Of the cases, the *Warshow* decision appears to be closest to our facts since evidence was offered that the plant in issue posed a serious hazard to the community and that resort to government officials had proven unavailing. *Id.* at 30-31 (Billings, J., dissenting). The majority disposed of the case on the ground set out in the text. One Justice concurred, suggesting that the more suitable ground for decision would have been a holding that the Legislature had, as a matter of policy, approved the development of nuclear power, thereby foreclosing the assertion of competing values in defense of a trespass. *Id.* at 26-29.

574-579 (1980) (disorderly conduct in blocking shipment of spent nuclear fuel).

From these cases and the other authorities cited, it is apparent that the application of the defense is limited to the following circumstances: (1) the defendant is faced with a clear and imminent danger, not one which is debatable or speculative; (2) the defendant can reasonably expect that his action will be effective as the direct cause of abating the danger; (3) there is no legal alternative which will be effective in abating the danger; and (4) the Legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue. Assuming, without deciding, that we would recognize and apply the defense in an appropriate case, we examine the defendants' showing here in light of the elements stated above.

2. *The defense in these cases.* The question of necessity is fairly raised "only if there is evidence that would warrant a reasonable doubt whether the [trespass] was justified" as a choice between evils. See *Commonwealth* v. *Thurber*, 383 Mass. at 331. If the question is properly raised, the Commonwealth then has the burden to prove the absence of justification beyond a reasonable doubt. See *Commonwealth* v. *Robinson*, 382 Mass. 189, 200-201 (1981), and cases cited. The defendant, however, has the initial burden of producing evidence sufficient to raise the issue. *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687-688 (1976). *Commonwealth* v. *Monico*, 373 Mass. 298, 304 (1977).

Even though the evidence appears to satisfy the first two elements, we conclude that the defendants failed to make a sufficient showing of the third element. Where there is an effective alternative available which does not involve a violation of the law, the defendant will not be justified in committing a crime. See *United States* v. *Best*, 476 F. Supp. at 46, 48-49, and cases cited; *State* v. *Olsen*, 99 Wis. 2d at 578; LaFave & Scott, *supra* at 387-388. See also *United States* v. *Bailey*, 444 U.S. 394, 410-411 (1980) (prison escape). The defendant must make himself aware of existing alternatives

and pursue those which are lawful, or show them to be futile in the circumstances. See *Commonwealth* v. *Thurber*, 383 Mass. at 330, quoting from *People* v. *Lovercamp*, 43 Cal. App. 3d 823, 831 (1974) (requiring evidence that "[t]here is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory; . . . [and] [t]here is no time or opportunity to resort to the courts").

In the present case, there were at least two alternative courses open to the defendants. First, the defendants could have sought to initiate action on the part of the NRC. Regulations of that agency provide that "[a]ny person may file a request . . . [that it] institute a proceeding . . . to modify, suspend or revoke a license [to operate a plant], or for such other action as may be proper" (10 C.F.R. § 2.206[a] [1981]) and that "[w]ithin a reasonable time" thereafter, the agency shall either institute such proceeding or state written reasons for not doing so (10 C.F.R. § 2.206[b] [1981]).

Following such private petition, the NRC has authority to act both effectively and immediately. "If, in the Commission's judgment, the public health and safety so requires, the Commission may take action to revoke, suspend or modify licenses, impose civil penalties, or issue cease-and-desist orders. 42 U.S.C. [§§] 2236, 2237, 2282; 10 C.F.R. §§ 2.200-2.205. While revocation, suspension, or modification actions generally must be in accord with the Administrative Procedure Act . . ., 5 U.S.C. [§] 558(b), if public health or safety so requires, such actions may be taken with immediate effect. 5 U.S.C. [§] 558(c); 42 U.S.C. [§] 2236[b]; 10 C.F.R. §§ [2.201(c) (permitting omission of notice to licensee)], 2.202(f) [permitting emergency relief on show cause order], 2.204 [permitting modification of license effective immediately]." *Petition for Emergency and Remedial Action*, 7 N.R.C. 400, 404 (1978). Thus, the NRC has stated that in an emergency situation, "[it] will, of course, take prompt remedial action, including shutdown of operating facilities, as it has in the past." *Id.* at 405.

Commonwealth v. Brugmann.

Second, the defendants could have sought to initiate action on the part of the Massachusetts Department of Environmental Quality Engineering (DEQE) or could have brought their own action in the Superior Court.[7] Under DEQE regulations, "radiation" and "radioactive material" constitute "air contaminants," all as defined in 310 Code Mass. Regs. § 7.00 (1980), and DEQE may regulate their emission to abate or prevent "a condition of air pollution." 310 Code Mass. Regs. § 7.01 (1980). See §§ 7.02, 7.03; G. L. c. 111, §§ 142A, 142B. Under additional regulations based on the same definitions, 310 Code Mass. Regs. § 8.02 (1980), the Commissioner has authority to declare an "Air Pollution Incident Emergency," in which situation he "shall . . . exercise such authority and powers as are provided in [G. L. c. 211, § 23] and as [he] . . . may deem necessary to effect . . . an abatement" of a "condition which constitutes a present or reasonably imminent danger to the public health." 310 Code Mass. Regs. § 8.15(1), (3) (1980). See G. L. c. 111, §§ 2B, 2C. Although these regulations do not state a procedure by which private individuals may initiate proceedings within DEQE, see 310 Code Mass. Regs. §§ 7.51, 7.52, 8.21, 8.22, 8.31 (1980), there is nothing which prevents individuals from "present[ing] proof" of violations, G. L. c. 111, § 2C, as appearing in St. 1975, c. 706, § 162, and seeking action on the part of DEQE. Moreover, a private right to enforce DEQE regulations exists under statute. "[U]pon the application of any person

[7] Congress has provided that individual States have a right concurrent with that of the Federal government to regulate nuclear plants and abate their hazards. Formerly, it was held that the Atomic Energy Act of 1954 preempted any State regulation of nuclear power plants. *Northern States Power Co.* v. *Minnesota,* 447 F.2d 1143, 1154 (8th Cir. 1971), aff'd mem., 405 U.S. 1035 (1972). The Clean Air Act Amendments of 1977, 42 U.S.C. §§ 7401 et seq. (Supp. III 1979), were intended to overturn that holding, and the States may now regulate radioactive emissions under standards more stringent than those established by the NRC, or may, in fact, prevent nuclear plants from being built at all. *Pacific Legal Foundation* v. *State Energy Resources Conservation & Dev. Commn.,* 659 F.2d 903, 927 & n.38 (9th Cir. 1981).

interested, with the approval of the department," the Superior Court "may enforce such regulations, and restrain the use or occupation of the premises or [a] portion thereof . . . until such regulations have been complied with." G. L. c. 111, § 142A, as appearing in St. 1959, c. 422. See G. L. c. 111, § 5B. Compare G. L. c. 111, § 142B.

In this case, there was no showing that the defendants had pursued any of these remedies, or that such pursuit would have been futile. The defendants' efforts to focus public attention on the general hazards of nuclear power, and the particular danger allegedly posed at the Rowe plant were doubtless well intentioned. However, the acts of trespass by which they chose to accomplish those goals will not give rise to the competing harms defense where established legal alternatives have been ignored. Nor is this requirement satisfied by the defendants' general reference in their memorandum to a "show cause suit" filed with the NRC some years earlier.[8] With this essential foundation of the defense lacking, compare *Commonwealth* v. *Dilone,* 385 Mass. 281, 285 (1982), the judge properly ruled that it was unavailable. Accordingly, we need not consider the question presented by the fourth element of the defense, i.e., whether it plainly appears that the Legislature has acted to exclude its operation in these circumstances.

3. *Self-defense and defense of others.* Relying principally on *Commonwealth* v. *Martin,* 369 Mass. 640 (1976), and *Commonwealth* v. *Monico,* 373 Mass. 298 (1977), the defendants argue that the evidence was sufficient to justify their conduct as action taken in the defense of others. Both of these cases, however, involved situations in which assaults

---

[8] That "suit" was apparently filed five years prior to the trespasses, and the defendants gave the trial court no further information as to its particulars. It does not appear whether it dealt with problems like those alleged here, whether the NRC ever ordered those problems corrected, or even whether the NRC ever acted on the matter. For these reasons, we do not consider the defendants' reference to this "suit" sufficient to demonstrate that it was futile to seek action on the part of the government agency most directly involved with policing the safety of nuclear plants.

and batteries were actually in progress. We have previously held the *Martin* case inapplicable in defense of trespasses like those here, on the ground that the action of the defendant in *Martin* "if . . . justified at all, was justified by the heat of battle." *Commonwealth* v. *Averill,* 12 Mass. App. Ct. at 262. Likewise, "consistent with the purpose of minimizing the effects of unlawful violent acts," the *Monico* case expressly conditioned the applicability of this defense on the "immediacy of the need to resort to force." *Id.* at 303.

It is clear from these cases that defense of others is a justification of very specific application. We do not think it was meant to apply in a case involving civil disobedience of the sort in issue, particularly since other remedies were available to redress the present grievances. For the same reasons, we also consider the doctrine of self-defense inapplicable in this context. See *State* v. *Olsen,* 99 Wis. 2d at 579-580.

*Judgments affirmed.*