*134 OPINION OF THE COURT
Laura E. Drager, J.
The defendants are each charged with one count of criminal trespass in the third degree (Penal Law § 140.10). They are accused of illegally entering and remaining in the office of Dr. Stephen C. Joseph, Commissioner of the New York City Department of Health (hereinafter the Department), on August 3, 1988.
A bench trial was held before this court in which the defendants raised a justification defense, claiming their action constituted a necessary emergency meeting held for the purpose of saving lives (Penal Law § 35.05 [2]). In the alternative, the defendants argued that Dr. Joseph consented to the meeting.
The trial was continued for decision on the motion for a trial order of dismissal and verdict. Before reaching these decisions it is first a statutory requirement to determine whether the defendants have presented sufficient evidence to support the justification defense as a matter of law. Finally, this decision addresses the motions to dismiss in the furtherance of justice raised by each defendant (CPL 170.30, 170.40; People v Clayton, 41 AD2d 204).
The defendants are all members of an interest group called ACT UP which seeks to focus attention on the AIDS crisis. On July 19, 1988, Dr. Joseph announced a reduction in the estimated number of HIV-infected people in New York City from approximately 400,000 to 200,000.[1]
The primary cause for this reduction resulted from a decrease in the city’s estimate of the number of gay men infected with the virus. Previously, relying on the 1948 Kinsey Report conclusion that "nationally, among white men, one in ten is 'more or less exclusively homosexual’ ”, the Department had estimated a New York City gay/bisexual population of from 250,000 to 500,000. Using several studies which had suggested that as many as 60% of the gay/bisexual men in the city were HIV-infected, the Department estimated that approximately 150,000 to 300,000 gay/bisexual men were infected.
*135 However, the Department had since found this estimate unsupported by the actual number of known AIDS cases. Given what is known about the rate at which people infected with the virus develop AIDS, far more AIDS cases should have developed if the estimate was correct.
As a result, the Department began to explore other methodologies to estimate the number of gay/bisexual men infected with the virus and on July 19, 1988 announced it had adapted a method developed in San Francisco. As a result of more specific information known about its gay/bisexual population, San Francisco had derived a figure representing the ratio between its gay/bisexual population infected with the virus and those with known AIDS cases.
The Department determined that the AIDS epidemics in New York and San Francisco bore sufficient similarities that New York could use the San Francisco ratio to determine the number of gay/bisexual men infected with the virus. Using this methodology, and accounting for a possible 15% underreporting of AIDS cases, the Department estimated between 46,000 to 76,000 gay/bisexual men in New York City were infected with the virus, a substantial decrease from its previous estimate.
The conclusions reached by the Department were released to the public at a press conference held on July 19, 1988.[2]
The defendants each learned of the new figures through the media — in particular, from a series of three articles which appeared in the New York Times on July 19,[3] 20 and 21, 1988. These articles raised serious concerns about the manner in which the figures were issued as well as the methodology used. Several community leaders and activists in the AIDS crisis were quoted as having deep reservations about the figures. They were also skeptical of the city’s motivations, suggesting that the intent was to reduce funding for treatment of AIDS patients.
The articles specified some of the reasons for these concerns. First, the figures were issued only two months after the city had issued its master plan for AIDS services which had cited the old estimate. Second, there seemed to be little advance warning to community leaders of the impending change. *136 Third, the figures were released at the same time that State Comptroller Edward J. Regan issued a report assailing the city for underestimating future health costs. The articles also suggested that the figures were suspect since they seemed to suggest that the city had only 100,000 gay/bisexual men in residence.[4]
On July 19 and 24 some of the defendants attended meetings held by ACT UP to discuss the figures and the concerns raised in the media reports. There was general disbelief as to the validity of applying a methodology developed for San Francisco to New York with its more diverse population, and a demonstration was scheduled for July 28 at the Department’s building. According to the defendants, on July 27, the Department released a working paper (the Report) setting forth its analysis resulting in the new estimate. Further, in an effort to dispel some of the confusion, Dr. Joseph spent approximately 15 minutes at a previously planned public forum answering questions about the Report, and then after hie left for another meeting other Department representatives continued answering questions. Some of the defendants were present at that forum and found the answers did nothing to dispel their confusion.
On July 28, ACT UP held the previously planned demonstration at the Department. Several of the demonstrators— including some of the defendants — went to Dr. Joseph’s private office and requested a meeting with him. Instead, they were offered a meeting with the Department’s counsel and a public relations staff member. The demonstrators rejected the offer believing only a meeting with Dr. Joseph would be of any value.
Members of ACT UP subsequently determined that further action was essential. They decided to hold what they called an unscheduled necessary meeting with Dr. Joseph in his office. They believed such action necessary to prevent loss of life that would result from a reduction of funding for AIDS health care which they believed would be the inevitable outcome of the Department’s reduced estimate of infected gay men.
*137 The defendants further believed this action necessary because they would otherwise be unable to arrange a meeting with Dr. Joseph. Some of the defendants claimed they had been denied a meeting approximately six months before (although this occurred after these defendants had had a meeting with Dr. Joseph). One of the defendants (Mr. Quester) claimed he had tried to arrange a meeting after the figures were released but could not get through to Dr. Joseph’s office by telephone.
On August 3, 1988, at approximately 3:00 p.m. the defendants entered Dr. Joseph’s private office without an appointment, disrupting an ongoing meeting concerning an AIDS issue. The defendants arrived with a lawyer, observers, still photographers and a video camera. Some of the defendants wore signs saying "Joseph resign”. They were told by uniformed Security Officer Salome, a peace officer, not to enter. This order was ignored. Upon entering the office, although a few of the defendants announced that they were there to hold a meeting, most of the defendants within minutes began shouting at Dr. Joseph, calling for his resignation. Dr. Joseph adjourned the meeting he had been holding.
The defendants were told by Sergeant Christine Harper, a peace officer and senior special officer with the Department of Health, that they were trespassing and if they did not leave they would be arrested. Subsequently, Charles Floyd, Director of Security for the Department of Health, gave the same warning as did another individual with him.
During the course of the action the defendants sat at Dr. Joseph’s conference table and one defendant, Mr. Allan Robinson, sat behind Dr. Joseph’s desk. Another defendant, Mr. Vance, banged on the conference table. At various times the defendants shouted abusive slogans. When Dr. Joseph sought to leave his office his way was blocked by some of the defendants (in particular, by Mr. David Robinson).
Arrests began within a few minutes after the defendants were told by Officer Harper that they were trespassing. However, a number of the defendants remained in the office until additional police could be called. During this time, Dr. Joseph, who had briefly left, returned to his office. Initially he sat at his desk. However, as the shouting and banging on the table continued, he moved to a seat at the conference table. As each defendant shouted a question or comment at him, Dr. Joseph looked at the person who spoke. Dr. Joseph never responded *138 to any question but within a short time the shouting by the defendants subsided. They continued asking him questions about the reduced estimate to which Dr. Joseph gave no response. Dr. Joseph was present as arrests were made.
The defendants argue that their action on August 3rd was justified to avoid the deaths of thousands of New Yorkers threatened by reduced funding for AIDS care that would result from the Department’s new figures. Some of the defendants further believed their action justified because the Report in their view was unscientific, racist and heterosexist.
The New York statutory embodiment of the necessity defense is found at Penal Law § 35.05 (2):
"conduct which would otherwise constitute an offense is justifiable and not criminal when: * * *
"2. Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue. The necessity and justifiability of such conduct may not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder. Whenever evidence relating to the defense of justification under this subdivision is offered by the defendant, the court shall rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a defense.”
As required by statute, this court must decide preliminarily whether the evidence offered by the defendants, if found credible, supports the defense as a matter of law.[5]
The New York statute was influenced by the "choice of *139 evils” provision of the Model Penal Code (ALI) at section 3.02.[6] The comment to that provision notes: "This section * * * reflects the judgment that * * * a qualification on criminal liability, like the general requirements of culpability, is essential to the rationality and justice of the criminal law, and is appropriately addressed in a penal code. Under this section, property may be destroyed to prevent the spread of a fire * * *. Mountain climbers lost in a storm may take refuge in a house or may appropriate provisions * * *. A druggist may dispense a drug without the requisite prescription to alleviate grave distress in an emergency. A developed legal system must have better ways of dealing with such problems than to refer only to the letter of particular prohibitions, framed without reference to cases of this kind.”
The Model Penal Code provision does not require that the evil sought to be avoided by the defendant be imminent. The drafters believed such a requirement "unduly emphasizes one ingredient in the judgment that is called for at the expense of others just as important.” (Model Penal Code § 3.02, Comment, at 17.)'
The drafters of the New York provision believed a more stringent statute appropriate, thereby limiting the defense to "rare and highly unusual circumstances.” (Staff Notes, Commn on Rev of Penal Law & Crim Code, Proposed NY Penal Law, at 317 [McKinney’s 1964 Spec Pamph].) This purpose was accomplished, by adding the requirement that the injury to be avoided be imminent. (See, Donnino, Practice Commentary, McKinney’s Cons Law of NY, Book 39, Penal Law art 35, at 90; Staff Comments, Commn on Rev of Penal Law & Crim Code, Rev Penal Law, at 258-259 [McKinney’s 1965 Spec Pamph].)
*140 It has been held that two elements must be met under the New York statute for action to be found justifiable and not criminal:
"First: Such conduct must be found to be necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor; and
"Second: The injury is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue.” (People v Brown, 70 Misc 2d 224, 227-228 [NY County 1972].)
There has been an increasing trend in New York and throughout the country for protestors of various causes to rely on a justification defense to excuse what would otherwise be criminal action. Most comparable to the conduct of the defendants before this court are cases involving demonstrations at nuclear power energy plants, missile manufacturer sites, selective service offices and prisons. In none of the reported cases of these types has the necessity defense been sustained.[7]
Several themes recur in the relevant case law. First, the actor must reasonably believe that his conduct is necessary to avoid an evil. "It is not enough that the actor believes that his behavior possibly may be conducive to ameliorating certain evils; he must believe it is 'necessary’ to avoid the evils.” (Model Penal Code § 3.02, Comment, at 12.) The commentator went on to note that this requirement would therefore "create” significant barriers to the use of this defense in cases of illegal political protest, citing United States v Kroncke (459 F2d 697 [8th Cir 1972]). That case concerned the defendant’s break-in at a selective service office with the intent to destroy draft registration cards to protest the Vietnam War. In denying the applicability of the necessity defense the court noted: "The common thread running through most of these cases in which the defense of necessity was asserted is that there was *141 a reasonable belief on the part of the defendant that it was necessary for him to act to protect his life or health, or the life or health of others, from a direct and immediate peril. None of the cases even suggests that the defense of necessity would be permitted where the actor’s purpose is to effect a change in governmental policies which, according to the actor, may in turn result in a future saving of lives.” (459 F2d, at 701; emphasis added.)
In People v Chachere (104 Misc 2d 521 [Dist Ct, Suffolk County 1980]) the defendant was convicted of trespass arising from a demonstration at the Shoreham Nuclear Power Plant. Defendant claimed his actions were justified in that he was attempting to stop construction at the site because of defects in construction. The court noted: "There’s no question that the defendant sincerely believed both morally and factually that the criminal act he committed would prevent a more serious harm to the public * * * [B]ut it is well-founded law that a moral conviction (no matter how strong), without the support of substantive and probative evidence is not enough to bring section 35.05 of the Penal Law into play. If that were the case, anarchy would prevail. Each of us could claim justification for criminal acts when we had strong moral convictions that our cause was just.” (104 Misc 2d, at 524.)
The second common theme in these cases is that the harm to be prevented must be imminent. In People v Brown (70 Misc 2d 224 [NY County 1972], supra) the defendants, inmates at the Manhattan House of Detention, took hostages in a prison uprising. The defendants claimed their action was in protest against and to publicize deplorable conditions. They further argued that previously filed grievances had been ignored. The court found that the defendants failed to offer proof that the injuries to be prevented were “about to occur” as required by the New York statute. (See also, State v Warshow, 138 Vt 22, 410 A2d 1000 [1979] [nuclear power plant demonstration]; State v Marley, 54 Haw 450, 509 P2d 1095 [1973] [trespass at corporate offices of military contractor]; Commonwealth v Capitolo, 508 Pa 372, 498 A2d 806 [1985] [sit-in at nuclear plant]; Commonwealth v Brugmann, 13 Mass App 373, 433 NE2d 457 [1982] [trespass at nuclear power plant].)
Third, and closely tied to the issue of imminence, is that the defense is unavailable where alternative options exist to the defendants. The Supreme Court, in United States v Bailey (444 US 394 [1980]), a prison escape case, said: "Under any definition of [the necessity defense] one principle remains constant: *142 if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,’ the defense will fail.” (444 US, at 410.)
Relying on the reasoning in Bailey (supra), the Ninth Circuit in a trespass situation at a missile assembly plant on an Air Force base noted: "Those who wish to protest in an unlawful manner frequently are impatient with less visible and more time-consuming alternatives. Their impatience does not constitute the 'necessity’ that the defense of necessity requires * * *. 'The defense of necessity does not arise from a "choice” of several sources of action; it is instead based on a real emergency.’ * * * Consequently, 'if there was a reasonable, legal alternative to violating the law,’ the defense fails. * * * [A] defendant’s failure to resort to the political process precludes the assertion of the necessity defense to charges arising from political protests.” (United States v Dorrell, 758 F2d 427, 431-432 [1985].)
Similarly, in denying the necessity defense in a trespass case arising out of a nuclear war protest at an arsenal, the Seventh Circuit held: "It is, of course, impossible to argue nuclear war is not a more serious harm than a peaceful, if unlawful, anti-nuclear prayer demonstration at the Arsenal. It is just as impossible, however, to argue that there are not reasonable alternatives to violating the law under which these defendants were convicted. * * * United States v. Bailey authoritatively answers appellants’ * * * argument” (United States v Quilty, 741 F2d 1031, 1033 [1984]; see also, United States v Seward, 687 F2d 1270 [10th Cir 1982], cert denied 459 US 1147 [1983] [trespass at nuclear plant site]; United States v Cassidy, 616 F2d 101 [4th Cir 1979] [trespass and damage of property at Pentagon over nuclear weapons]; United States v Richardson, 588 F2d 1235 [9th Cir 1978], cert denied 440 US 947 [1979], reh denied 441 US 937 [1979] [illegal importation of Laetrile]; State v Dorsey, 118 NH 844, 395 A2d 855 [1978] [trespass of nuclear power plant]; State v Warshow, supra; Matter of Weller, 164 Cal App 3d 44, 210 Cal Rptr 130 [Ct App, 1st Dist 1985]; LaFave and Scott, Criminal Law § 50, at 386.)
A fourth common theme in these cases is that the action taken by the defendant must be reasonably designed to prevent the threatened greater harm. In this regard, the sincerity of the defendant’s belief is not the determinative factor. In a Missouri case, defendants trespassed in the lobby of General *143 Dynamics’ corporate offices in the hopes of pressuring company executives into holding a meeting concerning the manufacture and deployment of Trident nuclear submarines. In denying the justification defense, the court noted "any expectation that such a meeting would result in the discontinuance of the manufacture of nuclear weapon systems is more accurately described as fanciful optimism than reasonable.” (State v Diener, 706 SW2d 582, 585 [Mo App 1986]; see also, People v Chachere, 104 Misc 2d 521, supra; State v Marley, supra.)
Fifth, the necessity defense cannot be used to "excuse criminal activity intended to express the protestor’s disagreement with positions reached by the lawmaking branches of the government.” (United States v Dorrell, supra, 758 F2d, at 432.) It is not for the courts to decide if an appropriate decision was made by the legislative or executive branches, among competing policy options. To extend the defense this far would violate the principle of separation of powers. (See also, State v Dorsey, supra.)
Turning to the facts in this case, this court finds that the defendants failed to offer evidence that would legally support the justification defense.
The defendants offered no proof that the issuance of the Department’s Report created an imminent emergency to anyone’s life other than their personal beliefs that it might. They offered no proof that the Report would have any immediate impact on funding for AIDS cases by either the city or State; nor did they offer substantive proof that the Report would even have such impact in the future. The only evidence offered by the defense to prove this point was the testimony of Timothy Sweeney, Deputy Executive Director for Gay Men’s Health Crisis (GMHC), who stated that the Report was likely to have an impact on AIDS funding in the future. However, Mr. Sweeney’s testimony was necessarily speculative. The defense offered no evidence that any legislator or member of the executive branch of government had even suggested reducing AIDS funding as a result of the Report.[8]
Even if the defendants believed the Report contained erroneous conclusions which needed immediate correction, the action they took was not reasonably designed to accomplish this end. Trooping en masse uninvited into Dr. Joseph’s office to attempt to hold a "meeting” while shouting "resign” and *144 "murderer” are not actions that could reasonably have been thought to accomplish the goal of changing the Report. That goal might have been achieved, if warranted, by offering alternative expert research and reasoned objections to the analysis contained in the Report.
It is clear that lawful actions could have been undertaken by the defendants along these lines. For instance, they could have accepted the offer to meet with the Department’s counsel on July 28 or they could have lobbied legislators to express their reservations about the Report. GMHC, an entity as concerned with the AIDS crisis and the accuracy of the Report as the defendants, elected to write a detailed letter to Dr. Joseph setting forth GMHC’s concerns about the validity of the Report.[9] The defendants could have done the same, but did not.[10]
Some of the defendants engaged in the action not only because they thought the Report would decrease government involvement in the AIDS crisis, but because they believed some of the ideas advanced in the Report were wrong.[11] However, one cannot use the necessity defense to justify unlawful action intended to limit the advancement of ideas contrary to one’s own. One’s moral convictions alone can never be the basis for a justification defense.
Finally, the defendants also objected to the manner in which the Report was issued. Although the way the Report was released may have created some confusion, it did not in and of itself create an emergency as proven by the fact that the defendants did not enter Dr. Joseph’s office for over two weeks after its issuance. It also merits consideration that no other AIDS activist organization found the type of action taken by the defendants a necessary response to the Report.
*145 Therefore, this court finds as a matter of law that the defendants failed to offer sufficient evidence for the trier of fact to consider the justification defense.
In the alternative, the defendants contend they were not trespassing because Dr. Joseph consented to hold a meeting with them. As a related issue, some of the defendants argue that being a public official Dr. Joseph was obligated to meet with them and that his office is a public place. Therefore a trespass could not have occurred unless the defendants received a lawful order to leave. Those defendants further claimed that due to the confusion in the office they never heard any order to leave.
The statute and case law make plain that a trespass can occur in a building open to the public if a lawful order not to enter or remain is personally communicated by an authorized person. Moreover, not all portions of a public building need be open to the public. "A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public.” (Penal Law § 140.00 [5];[12] see also, People v Martinez, 43 Misc 2d 94 [NY City Crim Ct 1964] [defendants guilty of trespass arising out of demonstration at police headquarters].)
Dr. Joseph’s office is located in the city’s Department of Health building at 125 Worth Street in Manhattan. Although the building has public areas, the evidence at trial revealed that Dr. Joseph’s office is a restricted part of the building. Secretaries and security officers monitor who enters the office. The office is used in a manner comparable to that of any executive’s private office. Department matters requiring regular public access are handled elsewhere in the building. Thus, *146 Dr. Joseph’s office is not open to the public and without his consent the defendants had no license to enter or remain in his office. (See, People v Taylor, 114 Misc 2d 680 [Sup Ct, NY County 1982].)
Defendants’ contention that Dr. Joseph consented to the meeting defies any credible evaluation of the evidence. The defendants base this claim on the fact that Dr. Joseph, during the demonstration, sat at the conference table with the defendants, and although he didn’t speak to them, appeared attentive and looked at each defendant as that person spoke.
The videotape of the demonstration taken by the defendants and offered into evidence by the People shows the defendants entering into the office without permission, and demanding that Dr. Joseph meet with them. Dr. Joseph never said he agreed to hold a meeting. In his testimony at the trial, Dr. Joseph said he felt angry at the defendants’ violation of the Department and frustrated that his meeting (concerning an AIDS-related issue) was interrupted. He sought to prevent any further escalation of the incident. The Department did not have enough officers to arrest all of the defendants immediately. It was apparent to this court that by sitting at the conference table with some of the defendants, Dr. Joseph defused the situation until more police arrived to arrest the remaining defendants. Where initially the defendants had been shouting and banging on the conference table, once Dr. Joseph sat with them, the defendants calmed down. This tactic can hardly be characterized as consent to hold a meeting.
"One does not acquire immunity from prosecution for trespass by closing one’s eyes to reality and stubbornly asserting an 'honest belief to remain where one is not privileged to be; rather, a defense is stated only when one acts in good faith in an honest but mistaken belief that one’s continued occupation of the premises is not unlawful”. (People v Tuchinsky, 100 Misc 2d 521, 524 [Dist Ct, Suffolk County 1979].) The evidence does not support a finding that Dr. Joseph consented to the meeting.
Moreover, the evidence overwhelmingly supports a finding that even if the defendants mistakenly believed that Dr. Joseph’s office was a public area, they were each personally warned that they were trespassing and they each refused to leave after being lawfully ordered to do so. (See, Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, *147 Penal Law art 140, at 8, citing People v Brown, 25 NY2d 374 [1969]; People v Licata, 28 NY2d 113 [1971].)
Such order is "lawful” when the proof demonstrates "that the particular order of exclusion had a legitimate basis and that, considering the nature and use of the subject property, its enforcement did not unlawfully inhibit or circumscribe the defendant from engaging in constitutionally or statutorily protected conduct.” (People v Leonard, 62 NY2d 404, 411 [1984].)
The defendants entered Dr. Joseph’s office unannounced and uninvited. They disrupted an ongoing meeting, screamed epithets and slogans and otherwise prevented the Commissioner from engaging in his scheduled business. The defendants were told three times, by three different security officers (and a fourth unidentified individual), either not to enter the office or, once inside, to leave.[13] Moreover, the defendants expressed no surprise when the police began arresting them.
Nor were defendants’ free speech rights violated by the order to leave. The mere fact that Dr. Joseph is a public official does not mean he has no privacy rights. The defendants intruded into his private office. The right to free speech does not extend to demonstrations in private offices. (People v Bush, 39 NY2d 529 [1976].) Even if Dr. Joseph’s office is considered a public place, defendants’ free speech rights could properly be restricted to reasonable time, place and manner regulations. (Olivieri v Ward, 801 F2d 602, 605 [2d Cir 1986], cert denied 480 US 917 [1987].) Defendants’ intrusive conduct was not protected by any constitutional or statutory right.
This court does not doubt that the defendants entered Dr. Joseph’s office with a moral conviction that their action was necessary and justified. But moral conviction is not a defense to criminal action. " '[It] is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.’ ” (United States v Kroncke, 459 F2d 697, 703 [8th Cir 1972], supra, citing United States v Moylan, 417 F2d 1002, 1009 [4th Cir 1969], cert denied 397 US 910 [1970].) Civil disobedience has a well-recognized place in the history of our country and the world, but those who *148 engage in such actions must understand that unless the law they violate is unconstitutional they will bear the consequence of their actions.
For these reasons this court denies the motion for a trial order of dismissal and finds each of the defendants guilty of criminal trespass in the third degree. Further, each of the defendant’s motion for a dismissal in the furtherance of justice is denied.

. The human immunodeficiency virus (HIV) is the precursor to AIDS. Many more people are infected with HIV than have developed AIDS. Expenditures for the AIDS crisis is based on the number of known AIDS cases, not the number of HIV-infected people. It is not yet known with certainty whether all people infected with the virus will succumb to AIDS. (See generally, New York City Strategic Plan for AIDS, May 1988.)

. The July 19 release also included the Department’s estimates of infected individuals for other groups (e.g., intravenous drug users, non-drug-using men and women).

. This article was published prior to the public release of the figures.

. At trial, Dr. Joseph responded to these issues noting (1) the master plan concerned planning for actual AIDS cases and was not an epidemiology study as was now being issued; (2) the Department does not consult with community groups when it releases statistics and does not "negotiate” statistics; (3) the figures were not released in response to the State Comptroller’s report; and (4) the Department specifically sought to avoid an estimate of the gay population.

. This court determined that under the unique circumstances of this case it was appropriate to reach this issue after presentation of the evidence at trial. Six of the defendants proceeded pro se. They indicated prior to trial that their respective defenses were not entirely the same as that of the five defendants represented by counsel or of each other. It therefore seemed most expeditious to have all of the evidence presented. Further, since this was a nonjury trial, there was no prejudice in having the trier of fact hear this evidence.

. "Section 3.02. Justification Generally: Choice of Evils.
"(1) Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:
"(a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and "(b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
"(c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.
"(2) When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this Section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.”

. The necessity defense has also been tried and generally rejected in antiabortion protest cases too. However, the underpinning for the court rulings are somewhat different than in other protest situations. The Supreme Court in Roe v Wade (410 US 113 [1973]) ruled and various State Legislatures enacted laws specifically legalizing abortions. Where a Legislature has made a determination of values, the necessity defense is inapplicable. (See, People v Crowley, 142 Misc 2d 663 [Justice Ct, Town of Greece 1989].)

. Indeed, Dr. Joseph testified that he was hoping to increase funding by expanding the types of cases entitled to assistance.

. Although the court refused to receive the letter in evidence at trial, the pro se defendants submitted it in their Clayton motion.

. It is worth noting that even if the Report adversely affected AIDS funding, the defendants would still not have been justified in their action. The Legislature and/or executive branches of government would, in that event, have made a policy determination. As has been noted before, the courts are not arbiters of competing public policies. The justification defense cannot be used to contest a disliked policy. (See, United States v Dorrell, 758 F2d 427.)

. For instance, some of the defendants believed — erroneously to the mind of the court — that the Report decreased the estimated gay/bisexual population of the city and the Report ignored gay black men altogether. All of the defendants objected to the application of a San Francisco-based methodology to New York.

. The complete relevant Penal Law sections read:
"A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property "(a) which is fenced or otherwise enclosed in a manner designed to exclude intruders” (Penal Law § 140.10).
"A person 'enters or remains unlawfully’ in or upon premises when he is not licensed or privileged to do so. A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public.” (Penal Law § 140.00 [5].)

. A review of the videotape of the demonstration reveals that each defendant was in a position to have heard at least one of these orders and most of the defendants were in a position to have heard all four orders to leave.