COMMONWEALTH *vs.* CASEY J. O'KANE.

No. 00-P-525.

Worcester. September 14, 2001. - December 27, 2001.

Present: LENK, KAPLAN, & KAFKER, JJ.

*Practice, Criminal,* Instructions to jury. *Necessity. Evidence,* Hearsay, Spontaneous utterance, Cumulative evidence, Cross-examination.

At the trial of a defendant charged with assault and battery, the judge correctly declined to instruct the jury on the defense of necessity, where the defendant failed to present "some evidence" on each element of the defense to support a reasonable doubt whether the crime was justified by necessity. [469-472]

At a criminal trial, there was no error requiring reversal in the admission into evidence, over objection on hearsay grounds, of a police officer's account of what the victim had told him of the incident, or in the judge's exercise of discretion in limiting additional cross-examination. [472]

COMPLAINT received and sworn to in the Gardner Division of the District Court Department on March 18, 1999.

On transfer to the jury session of the Fitchburg Division, the case was tried before *Sarkis Teshoian,* J.

*Michael A. Nam-Krane* for the defendant.

*Timothy J. Smyth,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. A six-person jury in Fitchburg District Court found the defendant, Casey O'Kane, guilty of assault and battery on his girlfriend, April Lepage. He appeals from the judgment of conviction.

The defendant defended at the trial by urging that he lacked criminal intent, that what the Commonwealth characterized as his intentional punch to April's face was in fact his slapping her cheeks in an attempt to bring her to consciousness from what he took to be an overdose of drugs. The jury by their verdict rejected the defendant's version. The defendant did not request

a jury instruction on a defense of so-called "necessity," which in some narrow situations allows a person to commit a breach of law in order to respond to an exigent danger. On this appeal the defendant argues that he was entitled on the record to an instruction on necessity, that his oversight in failing to request it should be forgiven, and that he should be accorded a new trial in which he may secure the instruction — a remedy to avert, so he says, a "substantial risk of a miscarriage of justice," *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

After recounting the facts as revealed at the trial, we deal with the defendant's argument and some further points and conclude that the conviction should be affirmed.

1. The jury could see the Commonwealth's case thus. In the year 1999, the complaining witness, April Lepage, and the defendant, Casey O'Kane, were living together at the home of April's sister, Betty Ouellette, at 79 City Hall Avenue, Gardner. April was an alcoholic and O'Kane at least a heavy drinker. On the morning of March 17, 1999, St. Patrick's Day, the defendant borrowed $10 from Betty and went out and bought vodka and beer to supplement the liquor on hand. It was after 1:00 P.M. when he returned home. During the afternoon, soon after Betty left to go to work, Nancy, sister of April and Betty, arrived with her son, Michael. The four — April, Nancy, Michael, and the defendant — sat on the porch, talking, with April and the defendant drinking. In the late afternoon, the defendant drove Nancy and Michael to their house on Cross Street. Then the defendant dropped by his friend Twyla's residence. There he continued his drinking.

Returning home after 7:00 P.M. (there is uncertainty about times), the defendant met April downstairs. When he admitted visiting Twyla, April upbraided him angrily, both for not remaining with her and for consorting with Twyla. April was suggesting that he was having an affair with Twyla, to which he answered that another man was present during his visit. April stormed upstairs to their bedroom. The defendant followed. The recriminations continued. The defendant pinned April by her wrists, then punched her in the face. This split or otherwise injured her inner upper lip and she bled from her mouth. She went downstairs and so was not present when the defendant did

damage to objects in the bedroom and broke through the glass of the room window.

About 11:00 P.M., Betty came in from work. April — by Betty's observation crying, her lips swollen, bleeding from the mouth — told Betty what had happened, that the defendant had punched her. When Betty encountered the defendant downstairs, she invited him to talk to her; she wanted his side of the story. They sat down in the kitchen and conversed for a while.

By 4:00 A.M. the defendant, having made his way outside to the rear porch of the house, was beating upon the door. Finally he broke through its plastic panel. At this point Betty called the police.

Officer James Trifiro at the police station, 31 City Hall Avenue, responded to a call of an ongoing breaking and entering at Betty's house. In a matter of seconds, he reached the rear of the house and saw a man, the defendant, seemingly trying to hide behind some railings of the back porch. The defendant, evidently drunk, responded with some difficulty to an order to come forward. After handcuffing him, Trifiro turned him over to backup Officer Fowler. Trifiro entered the house and spoke to Betty. He observed April: she was very upset, crying, in need of assistance; her lips were swollen; blood was coming from her mouth. He took two pictures of her face, received in evidence, showing blood stains on the upper lip. She said there had been an altercation and the defendant punched her in the face. Trifiro then placed the defendant under arrest. Trifiro saw the disturbance and broken window of the bedroom.

Later in March, April received a letter from the defendant, reproduced in part in the margin.[1] He wrote he loved her and implored her to save him from jail and give only the district at-

---

[1]The defendant wrote in his letter (redacted by agreement) that he was "facing jail. . . . If you are my friend, I ask you to help me out of this. . . . I'd like you to say *that you really can't remember cause you were drinking too. You signed the statement drunk cause we were both drinking.* I was just trying to wake you up cause I was scared. My story will be that you were jealous of Twyla and upset. I saw that you were passed out in your bed. I noticed your pills on the dresser. . . . opened . . . . I . . . slapped your face to try and wake you up. When you woke up you was mad. It's only cause of the booze and medications. This can explain the bruises & abrasion on your lip. April this may be the only way to help me. If you care at all for me please

torney an account of the episode as he then set it out. "This just may work." April testified the letter was a lie that the defendant was asking her to tell.

The defendant testified in his own behalf. His testimony corresponded with his letter sent to April. In the early afternoon he borrowed from Betty, bought liquor, and returned home. The drinking on the porch and visit by Nancy and Mike ran to 5:30 P.M., and, after driving them to Cross Street, he visited with Twyla, where he drank and also took two hits of crack cocaine. He arrived home at 7:00 or 7:30 P.M. April ranted at him for fifteen minutes, accusing him about Twyla. She ran upstairs. He sat in the parlor before the television set for forty-five minutes, then went upstairs. He found April lying on the bed in underwear and socks. Her drink was gone. On the dresser a pillbox of Xanax was open, he could not tell how far gone. He grabbed April by the arms, shook her, and called her name, without response. He slapped her cheeks trying to snap her out of it. Then he turned on the cold water in the bathtub, removed April's underwear and socks, and started to lift her, when she started to come out of it. She was upset, she yelled, she said, "I'm bleeding." She got dressed, yelled, "Why don't you go back to that whore," and started throwing punches at his chest. He backed up and in the turmoil his head and shoulder broke the window glass. "[Y]ou broke Betty's window," she said. He said, "I'm out of here. I'm leaving." It was about 9:30 P.M. He remembered nothing after that.

2. The defendant argues that upon this record he was entitled, had he asked for it, to an instruction on the defense of necessity. We think he was not so entitled, and further on we show that the verdict and outcome would have been the same if that instruction had been given.

The necessity defense is available only "under very limited circumstances" (per Liacos, C.J., dissenting in *Commonwealth v. Hutchins*, 410 Mass. 726, 733 [1991]). A passage in *Commonwealth v. Brugmann*, 13 Mass. App. Ct. 373, 379 (1982),

help me out. . . . Try to remember what you said is not true on the statement. You realize now that I was just scared and thought you took too many pills. This just may work. . . . P. S. Please tell them the story. Drop the charges." (Emphasis in original.)

since adopted also by the Supreme Judicial Court,[2] described these "circumstances" in terms of the following three essentials, each and all to be satisfied in order to achieve the defense: "(1) the defendant is faced with a clear and imminent danger, not one which is debatable or speculative; (2) the defendant can reasonably expect that his action will be effective as the direct cause of abating the danger; (3) there is no legal alternative which will be effective in abating the danger . . . ."[3]

The recent case of *Commonwealth* v. *Pike*, 428 Mass. 393, 400 (1998), teaches that "[a] judge should instruct [a] jury on necessity only if the defendant has presented 'some evidence on each element of the defense.' *Commonwealth* v. *Hood*, 389 Mass. 581, 595 (1983), quoting *Commonwealth* v. *O'Malley*, 14 Mass. App. Ct. 314, 325 (1982). In other words, the instruction should not be given unless the evidence supports at least a 'reasonable doubt whether the [crime] was justified by necessity.' *Hood, supra* at 594, quoting *Commonwealth* v. *Thurber*, 383 Mass. 328, 331 (1981)." In the present case, as in *Pike*, there was a failure to meet the requirement of "some evidence" to support a reasonable doubt, even when the evidence is observed in a light favoring the defendant, see *Commonwealth* v. *Lindsey*, 396 Mass. 840, 842 (1986).

We read the "clear and imminent danger" element to take in such danger whether threatening the defendant or a third person, April. See *Commonwealth* v. *Weaver*, 400 Mass. 612, 615 (1987); *Commonwealth* v. *Brugmann*, 13 Mass. App. Ct. at 374. It seems, however, that the exigent danger must have been present in an objective sense, and here April was not in fact in danger. Cf. *Commonwealth* v. *Schuchardt*, 408 Mass. 347, 350

---

[2]See *Commonwealth* v. *Pike*, 428 Mass. 393, 400 (1998), one of several decisions accepting the *Brugmann* formulation; it is closely followed in Instruction 6.02 on necessity of the Model Jury Instructions for Use in the District Court (1995).

[3]There is a fourth requisite in the *Brugmann* formulation but it needs no discussion here: that "the Legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue." In the *Pike* case, 428 Mass. at 400, the court says even if the four elements are satisfied, a necessity defense is sustainable "[o]nly when a comparison of the 'competing' harms in specific circumstances clearly favors excusing" the defendant's conduct (quoting from *Commonwealth* v. *Hutchins*, 410 Mass. 726, 731 [1991]).

(1990); *Commonwealth* v. *Leno*, 415 Mass. 835, 840 (1993); *Commonwealth* v. *Janvrin*, 44 Mass. App. Ct. 917, 918 (1998). If the viewpoint is taken to be that of a reasonable person (although that reagent does not appear until the second requisite), then we recall that April was active to the point of yelling at the defendant as she went in anger to the bedroom, and on the defendant's testimony he followed forty-five minutes later. April does not clearly figure as down and out in that interval of time with whatever number of self-dosed Xanax (tranquilizer) pills: "debatable or speculative" is a category that might possibly apply.

The second requisite takes up the position of a reasonable person and predicates he would expect his action to be effective as a direct cause of diminishing the danger. Slaps on the face as an antidote to a supposed critical overdose would not serve the purpose. See *Commonwealth* v. *Averill*, 12 Mass. App. Ct. 260, 261-263 (1981).

As to the absence of an effective legal alternative, the third requisite, a 911 call would serve and surely exceed in effectiveness slaps on the face; even a run to the police station less than half a block away would qualify. See *Commonwealth* v. *Thurber*, 383 Mass. 328, 332-333 (1981); *Commonwealth* v. *Janvrin*, 44 Mass. App. Ct. at 918.

Thus we think an instruction on necessity would not be justified on the record.

The artificiality of the defendant's claim to a necessity instruction is shown when we assume that such an instruction had been given. Ironically, the defendant's situation at trial would have been considerably worsened. His actual trial technique of trying to put in question a criminal intent (under standard instruction) was designed to make and did make a direct, simple, and uninhibited approach to the minds of the jury: the defendant could present a tableau of a man confronted with a difficult situation to which he responds perhaps irrationally. Under an added necessity instruction, the defendant would have to conjure with notoriously exacting requirements on which he could make no or little progress that could hinder a negative finding for the Commonwealth beyond a reasonable doubt. It is hardly conceivable that the jury, which rejected his

homespun approach to the issue of criminal intent, would be better disposed toward him when they were instructed with the stricter demands of the necessity defense. On the contrary, a jury appreciating the emptiness of that defense might be the more willing to accept the strong testimonial and photographic proof that the defendant did violence to the complaining witness, and they would disdain the transparent plot in the defendant's letter to subvert the facts. There is no risk of a miscarriage of justice in denying the defendant a new trial.

3. Anterior to the defendant's argument for reversal and a new trial with a right to an instruction on necessity is his alternative contention that there were errors in rulings on evidence at the trial, said to require reversal.

First, the defendant complains of the admission in evidence, over objection on hearsay grounds, of Officer Trifiro's account of what April told him of the incident. As April was still in a state of considerable perturbation at the time, the statement might be received as an "excited utterance," which evidently was the judge's view. See *Commonwealth v. Snell*, 428 Mass. 766, 777, cert. denied, 527 U.S. 1010 (1999). However, the point is trivial. Trifiro's testimony was cumulative upon similar evidence, including testimony at trial by April herself, which subjected her to cross-examination. See *Commonwealth v. Whelton*, 428 Mass. 24, 27-29 (1998).

Second, the defendant wanted to cross-examine April about her alleged past attempt to commit suicide, this possibly bearing on the defendant's claim of innocent intent in his haste to resuscitate her. If such material were admitted, said the Commonwealth, then it would want to show that the defendant had physically attacked April in an earlier episode like the present. The judge had discretion to put a limit on the interjection of supposed happenings that antedated the matter in suit and would have a diversionary effect, especially as the parties might attempt respectively to counter or explain these divagations.

The defendant's claim that his trial counsel provided ineffective assistance falls with the claim that he would have been helped by a necessity defense.

*Judgment affirmed.*